410 P.2d 100

STATE of Arizona ex rel. Obed M. LASSEN,
State Land Commissioner of the State
of Arizona, Appellant,

and

Douglas Basin Water Users Association,
Intervenors,

v.

Mary E. HARPHAM, Mary R. McCarty,
Chester L. and Lois D. Jones, husband
and wife, Appellees.

STATE of Arizona ex rel. Obed M. LASSEN,
State Land Commissioner of the State
of Arizona, Appellant,

v.

Gertrude SLOVER and Black & Jensen

Drilling Company, Appellees.

STATE of Arizona ex rel. Obed M. LASSEN,
State Land Commissioner of the State
of Arizona, Appellant,

v.

Ralph C. COWAN, Anderson Irrigation Drill-
ing Co., J. B. Hayes, Freeland Davis,
Gene Latimer and W. E. McGlothlin, Ap-
pellees.

Nos. 2 CA–CIV 155 to 2 CA–CIV 157.

Court of Appeals of Arizona.

Jan. 12, 1966.

Rehearing Denied Feb. 2, 1966.

Review Denied Feb. 23, 1966.

**480**

Darrell F. Smith, Atty. Gen., Dale R. Shumway, Sp. Asst. Atty. Gen., for appellant.

Robertson, Childers, Burke & Drachman, by Frank E. Drachman, Jr., Tucson, for appellees Harpham and McCarty.

Willoughby & Slaughter, by Stuart C. Willoughby, Willcox, for appellees Chester and Lois Jones.

Boyle, Bilby, Thompson & Shoenhair, by Marvin S. Cohen, Tucson, for appellees Slover, Black & Jensen Drilling Co., and McGlothlin.

Gentry, McNulty & Toci, by James F. McNulty, Jr., Bisbee, for appellees Cowan, Davis and Latimer.

John M. Williams, Douglas, for intervenor Douglas Basin Water Users Assn.

KRUCKER, Chief Judge.

The parties will be referred to as they appeared in the lower court.

The State Land Department initiated three separate actions for preliminary and permanent injunctions against each defendant herein to enjoin the completion of irrigation wells upon land lying within the Douglas Groundwater Basin, determined to be a critical groundwater area. The lower court issued temporary restraining orders against each defendant. Motions for summary judgment were filed by the plaintiff and by each defendant in each action. The lower court granted summary judgment in favor of each defendant in each case and quashed the temporary restraining orders issued against defendants. From these judgments, plaintiff appeals. The cases have been consolidated for purposes of this appeal.

The defendants in this appeal are owners of land located in the Douglas Groundwater Basin and the owners and operators of well drilling equipment located on these properties. Real property owners are Harpham and McCarty, Gertrude Slover, W. E. McGlothlin and Ralph C. Cowan. The owners of well drilling equipment located on these properties are Chester and Lois Jones, Black and Jensen Drilling Company of Texas, Anderson Irrigation Drilling Company of Texas, and Freeland Davis.

The operators and drillers of well drilling equipment are Hayes and Latimer.

The facts germane to this appeal are as follows: On or about April 1, 1965, the Arizona State Land Commissioner issued an order which designated an area of the State, lying within the Douglas Groundwater Basin, as a critical groundwater area. It is stipulated that this order became final and conclusive at midnight, May 5, 1965. The defendants had planned the construction of irrigation wells on their respective properties and had filed with the State Land Department notices of intention to drill wells prior to the effective date of the Department's order. These notices were returned by the State Land Department to the defendants together with well-drilling cards, reports of well-driller forms, and a report of equipment installed forms. Drilling of these wells thereafter was commenced and continued until halted by the institution of plaintiff's actions.

The defendants Harpham and McCarty commenced the construction of a well on their property on or about April 27, 1965, drilling to a depth of 53 feet by May 1, 1965, at which time drilling was stopped due to the inadequacy of their well-drilling equipment. Auxiliary equipment was moved from adjacent property to the uncompleted well site. Drilling resumed on May 6, 1965, and continued until halted by plaintiff's actions.

The defendant Slover planned the construction of 11 wells in order to irrigate some 1720 acres of land for agricultural purposes. The sites were surveyed, four and one-half miles of road was constructed to all 11 sites, "slush pits" were constructed and all 11 sites were "spudded-in" (holes dug either manually or mechanically to a depth of four to six feet and cased to receive the rotary drill bit). By midnight, May 5, 1965, two of the wells were completed and cased, three others were drilled to a depth of from 60 to 192 feet, and the remaining six wells were not drilled, resulting in the total expenditure of approximately $20,000 to $25,000. Drilling continued on well number four after May 5, 1965, until halted by the institution of this lawsuit. Plaintiff has stipulated that wells numbered one, three and four be removed from this action.

The defendant Ralph C. Cowan planned the construction of 45 wells on his properties located in the Sulphur Spring Valley of Cochise County. Engineers were employed to survey the 45 sites and 11 miles of road was built, providing access to these sites. Drilling was commenced on all 45 wells prior to May 5, 1965, going to depths ranging from 80 to 752 feet. By midnight of this date, four wells were completed and two rigs were moved to two other previously commenced wells where drilling continued until halted by plaintiff's action. Mr. Cowan expended over $68,000 up to May 5, 1965, on the construction of the completed wells and for equipment to complete construction of the remaining wells.

Defendant McGlothlin purchased two sections of land in Cochise County on which he planned the construction of eight irrigation wells in order to put the land into cultivation. The sites were surveyed, three test holes were drilled to determine water level, roads were constructed to the eight sites, and by May 5, 1965, all eight wells had been drilled to depths ranging from 220 to 640 feet. One well was fully completed and another fully drilled but not cased by this date. Drilling continued on the uncompleted wells after May 5, 1965, resulting in the completion of four more wells. Further drilling was terminated by plaintiff's action and three wells remain uncompleted. The total expenditure of funds to date approximates $57,000.

■ The sole issue in this appeal is interpretation of A.R.S. § 45–313, subsec. C, and specifically, the meaning of the words "substantially commenced", as contained in this statute. The statute provides:

"C. No permit shall be required for completion of any well located within a critical groundwater area and *substantially commenced* prior to the desig-

nation of the critical groundwater area, but the well or other works for the withdrawal of groundwater thus *substantially commenced* shall be completed within one year from the date of designation or alteration of the critical groundwater area." (Emphasis supplied.)

The language of the statute is unambiguous with the exception of the terms "substantially commenced". Substantial commencement of a well eliminates the requirement of procuring a permit to complete construction of the well in an area designated as a critical groundwater area. Such well, however, must be completed within one year from the date the area is designated as a critical groundwater area. This Court must determine whether defendants have "substantially commenced" the construction of wells on their respective properties prior to the designation of the Douglas Groundwater Basin as a critical groundwater area.

Concern for the development of more substantial supplies of water has been consistently manifested in agricultural reports, legislative enactments, and judicial decisions and solution of the problem is essential to meet the demands of a growing populace. This concern is amply demonstrated in the Report of the President's Water Resources Policy Commission, in its report published in 1950 "A Water Policy for the American People", Volume I, page 2, wherein the commission states:

"In all parts of the country—among engineers, conservationists, farmers, householders, and other ordinary citizens—there is a growing recognition that we must conserve and develop, as well as use, our natural resources. And in conservation and development, as in use, water is the key resource. * * * (W)ater is limited in relation to the many and varied needs for its use. These needs will grow in size and complexity as the population grows and as industry develops. * * * We can no longer be wasteful and careless in our attitude towards our water resources. Not only in the West, where the crucial value of water has long been recognized, but in every part of the country, we must manage and conserve water if we are to make the best use of it for future development. * * * (T)he management, conservation, and use of our water resources is inextricably bound up with the management, conservation, and use of our land and * * * both are essential to our expansion as a Nation."

Regarding subterranean water resources, the numerous legislative enactments clearly indicate the growing public concern as to the adequacy of groundwater supplies. As noted in "Economics and Public Policy in Water Resource Development", edited by Stephen C. Smith and Emery N. Castle, Iowa State University Press, Ames, Iowa, 1964, at page 311:

"Public concern in the conservation of groundwater is exemplified not only by the remarkable interest and activity in obtaining legislation in most western states since the 1930's, but by observations of courts that have passed on the legality of statutes, * * *. Thus we have the frank statement of the Kansas court that it must now look to the interest of the whole people, not merely that of the individual; the Arizona court's holding that a significant public interest takes precedence over the property interest of an individual;[1] and the recognition by the California court that the public welfare may be so profoundly affected by a falling water table as to justify taxing the water pumper to pay for its replenishment."

1. This statement, although not footnoted in this report, undoubtedly refers to the case of Southwest Engineering Co. v. Ernst, 79 Ariz. 403, 291 P.2d 764 (1955).

In reviewing these legislative developments as to groundwater, the authors' note, Smith and Castle, Id., pages 295–296:

"An enactment by the Territory of Dakota in 1866 was probably the first groundwater legislation in the West. * * * In 1891 and 1911 Kansas enacted rather unclear statutes pertaining to subterranean waters but without influencing noticeably the development of the state's water laws. From 1899 to 1919 various acts relating to the appropriability of groundwaters, either generally or within physical classifications, were passed in Idaho, Utah, Nevada, California and Arizona.

"About the turn of the century there appeared the beginning of a trend toward specifically including groundwaters within state administrative procedures for acquiring and administering appropriative rights. Then, shortly after 1925 a series of more and more comprehensive groundwater enactments began—a movement still active—in which a large majority of western jurisdictions have participated. The first two of these laws were passed in New Mexico and Oregon in 1927.

"In the 1930's outmoded groundwater laws were replaced in Utah and Nevada. Then from the close of the war to 1958 each biennium brought forth in the West at least one major groundwater enactment. States concerned in this progressive lawmaking (aside from amendments designed to make needed changes and improvements but without amounting to large-scale overhauling or the changing of fundamental principles) were Kansas and Washington in 1945; Wyoming, 1947; Arizona, 1948; Oklahoma and Texas, 1949; Idaho, 1951 and 1953; Colorado, 1953; North Dakota, South Dakota and Oregon, 1955; and Colorado, Kansas and Wyoming in 1957."

The myriad problems inherent in adopting functional legislation to adequately implement regional concepts of water use and conservation is pointed out in the following from Smith and Castle, supra, pages 303–305:

"A major problem in enacting any legislation imposing public control upon groundwater rights is that of making the law workable. As with laws in other fields, it may be so burdened with details which hamper the administrator unnecessarily or, on the other hand, so sketchy that he is left without adequate guidance in performing important functions. The administrator needs a reasonable measure of flexibility and opportunity for the exercise of sound discretion to perform his duties, but his authority is no more than the legislature has granted either expressly or by necessary implication; and of course an administrative officer is not the final judge of the necessity for a legislative implication. * * *

"The author once had occasion to correspond with several state engineers with respect to their groundwater administrative problems. * * * Need for more complete legislation, including authority and specific procedure for adjudicating and administering groundwater rights, was indicated in several replies. * * *

" * * * The communications of several state engineers stressed the importance of public relations and stated that educational programs were proving valuable in implementing controls in areas in which wells had been previously drilled and water used without thought of legal restriction. * *"

Arizona has not been so fortunate as to escape the legislative and administrative problems referred to in the above passage. Indeed, our administrators as well as legislators might well benefit from the findings noted above. The legislative history of our State Water Code, per se, demonstrates the problems encountered in the development of

water legislation.[2] In the excellent review of Arizona water law by Chief Justice Fred C. Struckmeyer, Jr., and Jeremy E. Butler, entitled "Water, A Review of Rights in Arizona", April 1960, as published by the Arizona Weekly Gazette, the following observation is made on page 44:

"It is safe to conclude that both in the fields of prior appropriation as applicable to surface water and of reasonable use as applicable to ground water, there are still many problems for which no solution has as yet been found and which will be a fertile source of litigation for a long time to come."

The litigation involved herein is illustrative of this fact. Although the statute with which we are here concerned, A.R.S. § 45–313, subsec. C, has been declared to be unambiguous, Vance v. Lassen, 82 Ariz. 188, 310 P.2d 510 (1957), the parties to this appeal markedly disagree as to the legislative intent expressed therein. Our Supreme Court stated in Vance v. Lassen, supra, at page 190, 310 P.2d at page 512, in citing A.R.S. §§ 45–313, 45–314, that:

"To interpret these two statutes requires no resort to statutory rules of construction for the language is clear and unambiguous. The legislative intent is patent.

"It is plain that section 45–313 expressly authorizes the filing of an application for a permit to construct an irrigation well in a critical groundwater area. It also prohibits the drilling of any such well without a permit."

However, in Vance v. Lassen, supra, our Supreme Court was concerned with mandamus proceedings for the issuance of a permit to drill a well under the mandate of A.R.S. § 45–314, and the problem therein considered was dissimilar to that in the case before this Court.

We agree that the language of A.R.S. § 45–313 is largely unambiguous. It undoubtedly was the intent of the legislature to avoid confounding its mandates with surplusage which would not meet the exigencies of manifold situations. Thus, the statute is couched in broad language with guidelines to the exercise of administrative and judicial discretion in the application of these provisions. For the legislature to have proceeded by defining terms would merely further complicate the already overwhelming task of administrators in the application of this law. Flexibility appears requisite to the successful discharge of administrative as well as judicial responsibilities. To attempt the formulation of rules which have as their object universal application covering all possible situations presents an impossible, and perhaps futile, task.

Plaintiff strenuously maintains that A.R.S. § 45–313, subsec. C, is substantially ambiguous and resort must be had to the legislative intent in the passage of this act. Phoenix Title & Trust Co. v. Burns, 96 Ariz. 332, 395 P.2d 532 (1964); Long v. Dick, 87 Ariz. 25, 347 P.2d 581, 80 A.L.R.2d 949 (1959). We feel compelled to conduct such a review.

Ascertainment of legislative intent dictates brief review of the Groundwater Code of 1948, Chapter 5, Laws of 1948, Sixth Special Session, Section 3, in which the legislature declared:

"United States Geological Survey reports, based on studies covering a long period of years, indicate that large areas of rich agricultural lands in Arizona are dependent, in whole or in part, upon groundwater basins underlying such lands for their water supply, and that in a number of such basins withdrawals of groundwater, greatly in excess of the safe annual yield thereof, is converting the lands of rich farming

2. For excellent discussions of the historic development and theory of Arizona Water Law, see State of Arizona v. State of California, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963); Stewart v. Verde River Irrigation & Power Dis-trict, 49 Ariz. 531, 68 P.2d 329 (1937); and the interesting article of Professor R. E. Clark "Groundwater Management: Law and Local Response" 6 Ariz.L.Rev. 178 (1965).

communities into critical groundwater areas, to the serious injury of the general economy and welfare of the state and its citizens. It is therefore declared to be the public policy of the state, in the interest of the agricultural stability, general economy and welfare of the state and its citizens to conserve and protect the water resources of the state from destruction, and for that purpose to provide reasonable regulations for the designation and establishment of such critical groundwater areas as may now or hereafter exist within the state."

There is little doubt that this state's legislature has been conscientiously concerned with the preservation of existing water resources and the above quoted declaration indicates that this concern has prompted the passage of the Arizona Water Code. This legislative pronouncement seems abundantly clear; the legislature acknowledged that the withdrawal of groundwater in certain areas was creating critical groundwater areas and the interest of the general community dictated the preservation of such water supplies through the development of "reasonable regulations for the designation and establishment of such critical groundwater areas as may now or hereafter exist within the state." This concern for the preservation of water as to agricultural land under cultivation was expressed by our Supreme Court in Southwest Engineering Company v. Ernst, 79 Ariz. 403, 410, 291 P.2d 764, 769 (1955), as follows:

"We are of the opinion that there is a preponderant public concern in the preservation of the lands presently in cultivation as against lands potentially reclaimable, and that where as here the choice is unavoidable because a supply of water is not available for both, we cannot say that the exercise of such choice, controlled by considerations of social policy which are not unreasonable, involves a denial of due process."

■■ We are not in disagreement with these pronouncements, nor with the fact that substantial public interests necessitate concern and protection. The legislature as well as our Supreme Court have noted that regulations must be "reasonable" and that "considerations of social policy which are not unreasonable" do not constitute a denial of due process. These statements recognize the substantial rights of individuals which also dictate concern and protection. The protection of individual rights is noted in Smith and Castle, supra, page 311:

"Protection of private property rights is unquestionably a matter of public concern; constitutional guarantees are invoked in securing the individual's rights."

■ Sound reason dictates the conclusion that the legislative intent in adopting A.R.S. § 45–313, subsec. C was to provide reasonable regulations for the control of water resources to effect water utilization in a manner most beneficial to the general public without such derogation of individual rights to constitute a denial of due process. The legislature thereby provided the State Land Department with administrative procedures designed to control the construction of wells in critical groundwater areas by requiring permits for their construction. Through such requirement, the State Land Department has information available regarding the disposition of water resources and the means to control such disposition. The act further provides that wells "substantially commenced" prior to the designation of an area as a critical groundwater area need no permit from the State Land Department for their completion, provided they are completed within one year from the date of such designation. In adopting Subsection C, therefore, the legislature obviously intended to provide means whereby individuals who had expended substantial effort and funds in the development of their lands by initiating the construction of irrigation wells are permitted to continue such development without retroactively depriving them of substantial property rights. The legislature, in the adoption of these statutes, has also clearly manifested an intent to de-

cline to provide rigid rules of application rendering conformance therewith and interpretation thereof practically impossible.

Plaintiff contends that we cannot expand or enlarge the meaning of statutes by terms not falling within its express provisions. State ex rel. Morrison v. Anway, 87 Ariz. 206, 349 P.2d 774 (1960) ; Ernst v. Collins, 81 Ariz. 178, 302 P.2d 941 (1956). However, plaintiff appears to urge this very act upon this Court, i. e., the development of an objective standard universally applicable. Neither this Court nor members of the legislature can profess to such omniscience as to. undertake the adoption of objective standards which would render these terms totally clear, unambiguous and which standards would be applicable to all possible situations that might arise thereunder. We can, however, define the terms in a manner likely to aid in the administration of this legislative enactment and provide guidelines in its application to specific circumstances.

The question is a novel one and the particular statute in issue peculiar to Arizona. Thus, a review of legislative and judicial pronouncements from other jurisdictions would serve no purpose.[3] The question of what constitutes substantial commencement has been considered in oil and gas cases which present a somewhat analogous situation to that before this Court. The following cases illustrate judicial interpretation of oil and gas lease provisions, particularly, provisions regarding forfeiture or termination of the lease for failure to substantially commence exploration and drilling.

In Flemming Oil & Gas Co. v. South Penn. Oil Co., 37 W.Va. 645, 17 S.E. 203, 206 (1893), it was stated that "The terms of

the covenant contained in said lease must be considered as having been complied with, no matter how slight may have been the commencement of any portion of the work which was a necessary and indispensable part of the work required in putting down the test well * * *." In Terry v. Texas Co., 228 S.W. 1019 (Tex.Civ.App., 1921), the court concluded that the lessee, by placing timbers for the erection of a derrick and machinery including a boiler on the ground where the oil well was to be drilled constituted compliance with a provision in the lease requiring him to commence to drill the well within a certain period of time. The word "commence" was defined as "To perform the first act of". In Solberg v. Sunburst Oil & Gas Co., 73 Mont. 94, 235 P. 761, 763 (1925), the Supreme Court of Montana stated "We are of opinion that the words 'commence drilling operations' denote unmistakably the first movement of the drill in penetrating the ground." The Montana Court distinguished between the terms of a lease providing for the "commencement of drilling operations," and the "commencement of operations". The above quote governs the former, whereas preliminary work necessary to actual drilling was sufficient to satisfy the latter type lease provision.

In the subsequent case of Petersen v. Robinson Oil & Gas Co., 356 S.W.2d 217 (Tex.Civ.App., 1962), the Texas Court quoted with approval the general rule from 2 Summers, Oil and Gas, § 349, pages 459-460, as follows:

"The general rule seems to be that actual drilling is unnecessary, but that the location of wells, hauling lumber on the premises, erection of derricks, pro-

---

3. Neither counsels' briefs nor independent research has revealed any statute from another jurisdiction comparable to A.R.S. § 45-313, subsec. C. Legislation pertaining to the administrative control and regulation of groundwater withdrawals is well reviewed in Clark, R. E., "Groundwater Management: Law and Local Response", 6 Ariz.L.Rev. 178, 199-208 (1965), wherein Professor Clark notes

that "the extent of administrative control over withdrawals varies greatly." Also, for an exhaustive review of water legislation, see the two volume publication of Shih, Yang-Ch'Eng, "American Water Resources Administration", Bookman Associates, Inc., N.Y., 1956, part of which, pertaining to groundwater conservation, is included as an Appendix hereto.

viding a water supply, moving machinery on the premises and similar acts preliminary to the beginning of the actual work of drilling, when performed with the bona fide intention to proceed thereafter with diligence toward the completion of the well, constitute a commencement or beginning of a well or drilling operations within the meaning of this clause of the lease."

A similar good faith test was applied by the California Supreme Court in the case of Butler v. Nepple, 54 Cal.2d 589, 6 Cal. Rptr. 767, 770, 354 P.2d 239, 242 (1960):

"It is true that under the authorities, work preparatory to drilling may be sufficient to constitute the commencement of drilling, but this rule is qualified by the requirement that such preliminary work must be something more than a pretense, i. e., must be done with the bona fide intention to follow it with actual drilling operations prosecuted with reasonable diligence."

Admittedly this case dealt with the assignment of an oil and gas lease calling for the commencement of drilling within a specified time and is not directly in point. However, it serves to note that California, at least in such cases, has also adopted the general rule of 2 Summers, supra, for determining the commencement of drilling operations.

Defendants urge that we adopt such a good faith standard for determining whether the construction of a well has been substantially commenced prior to the designation of an area as a critical groundwater area in accord with the oil and gas cases. However, those cases concerned the interpretation of contractual provisions between individual citizens and not the interpretation of legislative intent in the enactment of statutes. It should also be noted that courts, in their ruling interpreting such provisions of oil and gas leases, recognized the fact that delay rentals to the lessor ceased when the well was commenced but royalties would not begin until the well was completed and production begun. Thus, there is a period of time when the lessor was receiving no benefit under his lease and implicit, in such cases, is the fact that the lessor leased his land to derive benefit therefrom. A good faith requirement was, therefore, readily found in interpreting the term "commencement" in such cases.

■ Plaintiff, on the other hand, urges the adoption of a good faith test designed to preclude real property owners from beginning the construction of wells as a result of notice that their land will become bound by mandates resulting from its designation as a critical groundwater area. Thus, plaintiff appears to contend that such a standard would preclude real property owners from "getting in under the wire", so to speak, of the effective date of such a critical groundwater designation. However, the legislature gave such right to real property owners affected by critical groundwater designations by providing for publication of the department's order for four weeks, and only thereafter does such order become "final and conclusive". A.R.S. § 45–310, subsec. B. We believe that the legislative purpose in so doing was to give landowners advance notice and see no "bad faith" in their doing what plaintiff would proscribe.

■■ We feel compelled to admit that the good faith requirement of the general rule as expressed in 2 Summers, supra, has considerable merit but must conclude that if the legislature intended the inclusion of such a provision in the passage of A.R.S. § 45–313, subsec. C, it could have easily so provided. Although it might well be meritorious for this Court to conclude that the legislature intended that the construction of irrigation wells prior to the designation of an area as a critical groundwater area must be substantially commenced in good faith, and that such good faith is evidenced by a showing that the construction is consistent with the general use and planned development of the property, such is not provided for in the statute and this Court cannot judicially legislate. The legislature has only provided that (1) the construction of a

well be substantially commenced prior to the designation of the area in which it is located as a critical groundwater area, and (2) that such well be completed within one year from the date of such designation. Nowhere does the legislature indicate that the construction of irrigation wells must be consistent with the general use and planned development of the property, nor that the construction must be accomplished in good faith.

From the oil and gas cases, it appears that the construction of wells is commenced by the actual movement of the drill in penetrating the ground, as well as the performance of preliminary functions incident thereto. However, our legislature qualified the term "commence" by adding the additional requirement that such wells be "substantially commenced" prior to the designation of an area as a critical groundwater area. Insignificant activity is not sufficient; something more must be accomplished. How much more? Is the filing of a notice of intent to drill a well with the State Land Department, or the hiring of a driller, or the actual surveying of a well site, or the grading of roads, or the "spudding-in", either manually or mechanically, sufficient? The word "substantial" must be more closely examined.

■ We are cognizant of the fact that resort to the definition of terms in interpreting statutory enactments is often beneficial, and equally aware that a literal interpretation of the words of a statute cannot serve to thwart or frustrate the manifest intent of the legislature. State ex rel. Church v. Arizona Corporation Commission, 94 Ariz. 107, 382 P.2d 222 (1963); Feffer v. Bowman, 90 Ariz. 48, 365 P.2d 472 (1961). Resorting to Webster's New International Dictionary (3rd ed. 1961), we find a number of varying meanings for the word "substantial". Among the meanings given are: "being of moment; important, essential"; "having good substance; firmly or stoutly constructed"; and "of or relating to the

main part of something". There are other meanings which would give the word less substance than these, but we believe that the legislature had concepts similar to these in mind in choosing this word. We do not believe that the legislature intended that any commencement which might be deemed "insignificant" would be sufficient to satisfy the requirement at hand. We are dealing in an economic and proprietary area and dollars and cents are the commonly accepted measurements in these fields. We believe that the amount expended in the commencement under consideration, as opposed to the total cost of the finished well, is important.

■ The governing statute, A.R.S. § 45–313, subsec. C, does not provide that a well must be drilled, and, therefore, we cannot adopt a rule that will exclude work performed manually. Considering the expressed purposes of the legislature in adopting the Act in question and considering the specific statute before us in the light of all of the other provisions in this Act, we hold that the words "substantially commenced" require that the excavation of the well itself must have begun to some degree, either by penetration of the earth with a rotary drill, or the excavation of the earth manually as was done in this case by the "spudding-in" of the well. In those cases where the extent of such excavation alone cannot be said in common parlance to be substantial, then other work performed or actions taken which are necessary to accomplish the final construction of the well may be considered in determining whether the commencement of excavation was a substantial commencement. Such other factors, to be considered in addition to actual excavation of the well itself, may include the grading of road for the purpose of providing ingress and egress to the well site, the purchase of sufficient well casing and drilling mud, as well as other necessary supplies, to complete the well, the construction of slush-pits, as well as others. In considering these factors in conjunction with the actual excavation

of earth from the well itself, close questions of fact may occasionally present themselves and such will necessarily have to be passed upon by the trier of fact.

We do not believe that it is necessary that a drilling rig be poised over the hole on the date an area is designated as a critical groundwater area. The legislature clearly provided that wells substantially commenced prior to this date may be completed within one year from the date of such designation. Thus, a real property owner who substantially commences the construction of an irrigation well and is financially unable to proceed, or because of inadequate drilling equipment is forced to discontinue construction until other equipment is obtained, is not precluded from completing the well provided that such well is completed within the one year mandate of A.R.S. § 45–313, subsec. C.

As to the defendants Harpham and McCarty, and their drillers Chester and Lois Jones, the facts show that as of midnight, May 5, 1965, in addition to the completion of preliminary work, the construction of their well had proceeded to a depth of 53 feet. We hold that, as a matter of law, this constitutes substantial commencement in accordance with A.R.S. § 45–313, subsec. C.

As to defendants McGlothlin and Anderson Irrigation Drilling Company, the facts show that eight wells were planned and that by midnight, May 5, 1965, two wells were completely drilled, one was in the process of being drilled, and the remaining five wells were drilled to a minimum depth of 220 feet. Wells numbered one and eight have been removed from this appeal by stipulation. We hold that, as a matter of law, all six remaining wells were substantially commenced in accordance with A.R.S. § 45–313, subsec. C.

As to defendant Cowan, and his drillers, the facts show that 45 wells were planned for construction, that all wells were drilled to depths ranging from 80 feet to 752 feet, and that Cowan had expended over $68,000 to May 5, 1965, in this construction. In accordance with these facts, we hold that, as a matter of law, all 45 wells were substantially commenced within the requirements of A.R.S. § 45–313, subsec. C.

As to defendants Slover and Black and Jensen Drilling Company, the facts show that by midnight, May 5, 1965, two wells were completed and one was being drilled. These three wells, numbered one, three and four, have been removed from this appeal by stipulation. In addition, wells numbered two and five were drilled to depths of 192 feet and 135 feet, respectively, by this date. We hold that, as a matter of law, these two wells were substantially commenced in accordance with A.R.S. § 45–313, subsec. C.

Pertinent facts required to resolve this appeal as to wells numbered 6 through 11 are as follows: the construction of an 11-well unit was planned in March 1965; Mrs. Slover contracted for the drilling of the 11 wells at $400 plus $8.85 per foot well for all completed wells; the well sites were surveyed, four and one-half miles of road was constructed to all 11 sites, "slush pits" were constructed for all sites, and all sites were "spudded-in" (holes dug either manually or mechanically to a depth of four to six feet and cased to receive the rotary drill bit); and defendant Black and Jensen Drilling Company ordered 5000 feet of well casing and seven tons of drilling mud, sufficient casing and mud for the construction of all 11 wells, and purchased oxygen acetylene, welding and supplies for use in constructing the 11 wells. In addition, the facts further show that Mrs. Slover expended between $20,000 and $25,000 in the construction of the 11 wells prior to midnight, May 5, 1965. In accordance with these facts, we hold that as a matter of law the "spudding-in" of the six wells, in conjunction with the other work performed as illustrated by the above facts, was sufficient to constitute

substantial commencement of the wells in accordance with A.R.S. § 45–313, subsec. C.

The judgments of the lower court, awarding these defendants summary judgment, are affirmed.

HATHAWAY and MOLLOY, JJ., concur.

## APPENDIX

The following excerpt from Shih, Yang-Ch'Eng, "American Water Resources Administration" Bookman Associates, Inc., N. Y., 1956, is reprinted to indicate groundwater legislation in other jurisdictions in contrast with Arizona's Water Code, and especially A.R.S. § 45–313.

Subsection 2  Water Conservation

(a) *Underground Waters*—Underground waters have received greater attention of the state government than surface waters in water-conservation regulation. In most of the states having this regulation, the regulation is concerned with *artesian wells* only. The simplest form of this regulation (i. e., that of artesian wells) is a blank prohibition against waste of water (purely criminal), coupled in some states with the requirement of capping and casing (e. g. California and Colorado) or a definition of "waste" (California, for example). The laws of Colorado (Statutes, ch. 11, secs. 2 and 3:

L.1887, p. 52, secs. 1 and 2) and California (*Water Code*, Division 1, ch. 1: Stats. 1907, ch. 101, as amended) contain provisions of this kind. A more progressive form of the regulation of artesian wells with view to preventing waste of water consists in the attachment of administrative action to the prohibitive regulation. This is found in Texas, Minnesota, Idaho, North Dakota, Nevada and Florida. For the sake of brevity, the relevant statutory provisions of these states are cited below:

Texas...."Any artesian well which is not tightly cased, capped and fur-

nished with such mechanical appliances as will readily and effectively arrest and prevent the flow from the well through the strata through which it passes is hereby declared a *public nuisance* and subject to be *abated* as such, *upon the order* of the (state) board (of water engineers)."—L.1917, ch. 88, sec. 91.

Minnesota...."* * * *The Commissioner (of Conservation)* is authorized to require the owners to control artesian wells to prevent waste." —L.1939, ch. 327, sec. 5; as amended by L.1947, ch. 142, sec. 15.

Idaho...."Any artesian well, which is not capped, equipped or furnished with such mechanical appliance as will readily control the flow of water from such well, is hereby declared to be common nuisance; and any artesian well, which is capped, equipped or furnished with a mechanical appliance for arresting and preventing the flow of water therefrom, which cap, equipment or mechanical appliance has not been *approved by the commissioner of reclamation*, is hereby declared to be a common nuisance * * *" Every owner, occupant or tenant of the land upon which an artesian well is situated "shall apply to the commissioner of reclamation for the *approval* of any installed or proposed mechanical device for controlling the flow of water from such artesian well; * * * and shall change, alter or install only such equipment as shall be *approved* by the commissioner of reclamation." —L.1921, ch. 196.

North Dakota....Artesian wells should be equipped with a valve or valves to control the flow of water. The *state* geologist is authorized to *enforce* this provision. And, "the state geologist, the state engineer, and the county superintendent of schools of any county in which an artesian well is located may make such addi-

tional reasonable *rules and regulations* governing such well as a majority shall determine. * * * "—L.1921, ch. 17, as amended by L.1925, ch. 89.

Nevada...."No person controlling an artesian well shall suffer the waters therefrom to flow to waste. * * * The owner of any artesian well from which water is unnecessarily wasted shall be deemed guilty of a misdemeanor, and, if upon fifteen days' written notice * * * the owner fails to abate or refuses to abate such waste, the *state engineer* * * * may * * * take such steps as may be necessary to *abate such waste.* * * * The cost thereof * * * shall constitute a valid lien against the interest of such owner or owners in default * * * "—L.1939, ch. 178, sec. 8. (For the definition of "waste", see ibid., sec. 2).

Florida....All artesian wells must be provided with valves for controlling water-flow. In case of default on the part of the person or persons having control thereof, the *state geologist* or the sheriff concerned may install the same at the expense of the former.—L.1953, ch. 28253.

A stronger form of state regulation over *artesian wells* is the imposition of certain limitations on the use of the water taken from such wells. There are limitations as to the kinds, amounts and time of the use of water. In the above-mentioned law of California, the beneficial use of artesian water is limited to one-tenth of the miner's inch per acre on a yearly basis in case of irrigation. In Colorado, a law of 1935 (ch. 8 [sic] ) [1] limits the use of artesian water to domestic and manufacturing purposes, in the hilly areas of that state. Washington laws have declared a kind of "closed season" on the use of artesian water, and prohibit the "escape" of water from an artesian well, except for domestic and stock uses, between 15 October of each year and 15 March of the ensuing year in areas where artesian water is customarily used for irrigation (Revised Code, ch. 90.36: L.1901, ch. 121; as amended by L.1929, ch. 138). Under the laws of South Dakota (Code, ch. 61.-04: L.1891, ch. 80, sec. 42 et seq.; as last amended [sic] [2] by L.1941, ch. 369, sec. 1), artesian wells may be bored only for domestic, manufacturing or irrigation purposes, and with respect to wells constructed subsequent to 9 March 1891, no more water can be withdrawn for such uses than is actually needed. The State Engineer is authorized to re-locate an artesian well if he, upon the complaint of any party affected, should find it interferes with other wells.

The regulation of *artesian water* in New Mexico (L.1935, ch. 43) is even more comprehensive and far-reaching. Not only the drilling but also the repair, plugging or abandonment of an artesian well is to be approved by the state engineer. The wasting of water of an active artesian well is declared a public nuisance, which the owner is required to abate. In the default of the latter, the State Engineer or the artesian conservancy district concerned may summarily abate it at his cost. The right to use the waters of an artesian well abandoned for more than four years is forfeited to the state; and if any water is found being wasted, the same officer or district may summarily stop it. A loss of more than 20 percent during delivery in canals, ditches and so forth is considered a waste. Earthen ditches are limited to a length of 1.5 miles and concrete-lined or other impervious ones to 2 miles if built prior to 6 September 1912. Artesian waters can be stored only for the purposes of irrigation, and no stor-

1. Laws of 1935, ch. 80.

2. Repealed.

age reservoir can be built with a greater capacity than is necessary to store a continuous flow for 48 hours (or 96 hours when the maximum discharge is less than 300 gallons per minute).

In New York, Utah, Wisconsin, Indiana, New Jersey and Arizona, there is state regulation of *all underground waters,* both artesian and non-artesian. New York laws require the approval by the Division of Water Power and Control of the Department of Conservation of the installation or operation by any person of a well or wells in the Counties of Kings, Queens, Nassau and Suffolk *when* the total capacity of all old and new wells on any one property withdraw water in a rate exceeding forty-five gallons per minute (Conservation Law [McKinney's Consol. Laws, c. 65], sec. 521–a: L.1933, ch. 563, sec. 3 [sic] [3]; as last amended by L.1954, ch. 135). Under Utah laws, the State Engineer may at any time order the owner, lessee or person in charge to repair or install caps, valves or casings on any well or tunnel or to plug or fill it in order to prevent waste or contamination of underground water (Code, sec. 73–5–9: L.1935, ch. 105, sec. 2). In Wisconsin, no wells may be constructed, installed or operated where any such wells singly or collectively discharge more than 100,000 gallons of water a day, without the approval of the State Board of Health (Statutes, sec. 144.03, subdivs. (7) and (8): L.1945, ch. 303).

In Arizona, the Ground Water Law of 1945 stipulates that all old irrigation or drainage wells in existence prior to 3 October 1945 must be registered with the State Land Department, and that prior notice of intention to drill a new well must be submitted to the same agency before construction is started. This law was augmented by the Ground Water Law of 1948, which provides that the said Department, either in its own motion or upon the petition of twenty-five persons using underground water primarily for irrigation purposes or of one-fourth of all the underground-water users of a certain underground-water basin or aquifer, may declare and designate such basin or aquifer as a *critical ground-water area,* after a public hearing. In such area, no irrigation well may be drilled without first obtaining a permit from the State Land Commissioner; and "no permit shall be issued for the construction of an irrigation well within any critical area for irrigation of lands which were not irrigated at the effective date of the Ground Water Code of 1948 (i. e., 24 June 1948)" or of lands not under cultivation between 24 June 1943 and 24 June 1948. In addition, "the Commissioner may require any person making a groundwater withdrawal in a critical ground water area to furnish reasonable factual information regarding the use and quantity of such withdrawals, * * * whether the withdrawal be by means of irrigation wells, domestic wells, industrial wells, or in some other manner"; and, "to prevent waste, all flowing wells must be capped or equipped with valves. * * *" In 1953, a law was passed (ch. 42) which designated certain areas in Central Arizona as "restricted areas," in which the drilling of irrigation wells was prohibited until 31 March 1954. The same law also introduced two kinds of new permits. First, permits of the said Commissioner are required for the replacement or deepening of an existing irrigation well. Secondly, a permit must be obtained from the same officer to complete an irrigation well the construction of which is already commenced. Such permit expires at the end of three months from the date of its issuance, and the well concerned

---

3. Laws 1933, ch. 563, sec. 2.

may not irrigate more than 320 acres of land.

New Jersey statute (Statutes, tit. 54 [sic], ch. 4A [N.J.S.A.]:[4] L.1947, ch. 376; as amended by L.1951, ch. 193, sec. 1) directs that "the Division of Water Policy and Supply of the State Department of Conservation shall delineate from time to time such areas of the state where diversion of subsurface and percolating waters exceeds or threatens to exceed, or otherwise threatens or impairs, the natural replenishment of such waters." In such areas, no diversion more than 100,000 gallons a day may be made without a permit from the said Division. However, valid diversions existing at the time of the passage of the Ground Water Act of 1947 (ch. 376, op. cit.) are exempted from this law. In 1951, a law was enacted (ch. 193, op. cit., sec. 2 et seq.) which requires owners of abandoned wells to seal these wells. "A well not in operation for three or more years or improperly maintained to prevent contamination may be deemed to have been abandoned."

Under an Act of 1951 (ch. 29), the Department of Conservation of Indiana has the authority to designate areas where the withdrawal of underground waters exceeds their natural replenishment as *restricted use areas*. In such areas, permits of the said Department are required for *new* withdrawals of underground water (that is, withdrawals *in addition to* those existing at the time of the designation of a restricted use area, which may be zero) in an amount (for each withdrawal) of more than 100,000 gallons a day. It may be noted that this regulatory measure does not affect the right to the use of water in a manner other than the limitation of the quantity of water to be used, and that for this reason it is not to be regarded as a measure of water-use regulation (which means the regulation of the right to the use of water). This is made the more explicit by the provision that permits are issued only to the owners or tenants of the overlying lands. To further help conserve the underground waters, the said Department may require the water used to return, as far as possible, to the ground, and order owners of artesian wells to install control devices. These measures, too, are operative only in restricted use areas so designated by the said Department.

As will be discussed in the following Section, in the several Western states, some or all of the underground waters are subject to state water-use regulation through the issuance of water-use permits. So far as underground water is concerned, such permits carry as a necessary *incident* the permission of the state for the construction and operation of wells. A number of states have laws providing for the licensing of the *profession* of well-drilling. Such licensing supplements state regulation of underground waters; for its objective is apparently to insure that all wells are so constructed as to secure best conservation of underground waters.

4. Statutes, Tit. 58, ch. 4A.