110 P.3d 357

William D. **FEARNOW** and Elizabeth Fearnow, Plaintiffs–Appellees,

v.

**RIDENOUR, SWENSON, CLEERE & EVANS, P.C.,** Defendants–Appellants.

No. 1 CA–CV 03–0650.

Court of Appeals of Arizona, Division 1, Department B.

April 19, 2005.

Damore Law, P.C. by David A. Damore, Scottsdale, Attorneys for Plaintiffs–Appellees.

Osborn Maledon P.A. by Mark I. Harrison, Phoenix, Attorneys for Defendants–Appellants.

**OPINION**

WEISBERG, Judge.

¶ 1 Ridenour, Swenson, Cleere & Evans, P.C. ("RSCE") appeals from the judgment

awarding William and Elizabeth Fearnow $86,500.00 for William Fearnow's equity interest in RSCE. The trial court concluded that the "Voluntary Withdrawal" provision in the Shareholder Agreement between Fearnow and RSCE unlawfully restricted Fearnow's right to practice law. Accordingly, the court found the Shareholder Agreement invalid. The court further held that Fearnow could recoup his equity interest in RSCE under the Arizona Professional Corporations Act ("Act"),[1] as a "disqualified person" who could compel RSCE to acquire his share for its fair-market value.

¶ 2 For the following reasons, we conclude that the Voluntary Withdrawal provision of the Shareholder Agreement constitutes an unlawful restriction upon Fearnow's right to practice law, but we further conclude that Fearnow has no right to compensation under the Act.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 3 In 1987, Fearnow became a partner in the law firm of Ridenour, Swensen, Cleere and Evans (the "Partnership"). Fearnow paid $33,674.42 for his partnership interest.

¶ 4 In 1991, the Partnership dissolved, and the prior partners formed the RSCE professional corporation. Fearnow received one share of stock in RSCE.

¶ 5 On November 27, 1997, RSCE executed the last version of its Shareholder Agreement, which included a section governing the "Withdrawal of Stockholders." This section included a provision for the "Voluntary Withdrawal" of Stockholders, which stated:

> Other than retirement, a Stockholder who withdraws from the Corporation shall tender his or her Share to the Corporation for no compensation.

¶ 6 In February 1998, Fearnow voluntarily left RSCE to practice law at the firm of Walker Ellsworth, P.L.C., and took several of RSCE's clients with him. He then demanded that RSCE pay him $33,674.42 as compensation for his share of stock. When RSCE refused, the Fearnows filed this lawsuit seeking to invalidate the Voluntary Withdrawal provision of the Shareholder Agreement. The Fearnows also sought compensation from RSCE based on theories of unjust enrichment and conversion.

¶ 7 The parties filed cross-motions for summary judgment on the validity of the Voluntary Withdrawal provision of the Shareholder Agreement. The trial court (the Honorable Colin F. Campbell) ruled that the Voluntary Withdrawal provision of the Shareholder Agreement was a restriction on a lawyer's right to practice law, in violation of Ethical Rule 5.6, Arizona Rules of Supreme Court 42 ("ER 5.6").[2] The court concluded that the striking of the provision left a "large gap in the [S]hareholder [A]greement ... [with] no remaining term cover[ing] what happens in the event of voluntary withdrawal or retirement." Because the Shareholder Agreement had no severability clause and the court could not rewrite the stricken material terms for the parties, it held the entire agreement to be invalid. The court then ordered the parties to submit additional briefing on the issue of what would be the appropriate remedy.

¶ 8 The parties filed cross-motions for summary judgment on the remedy issue. RSCE reasoned that the Fearnows had no remedy because the Act afforded none. It asserted that the Act provided that a corporation's obligation to repurchase stock arose only upon the death, dissolution or disqualification of a shareholder. RSCE argued, therefore, that Fearnow was not entitled to the compulsory repurchase of his share because he was not dead, could not be dissolved, and was not a "disqualified person" under the Act. Fearnow conceded he had no remedy under the Act, but sought equitable relief from the court based on restitution.

1. Arizona Revised Statutes ("A.R.S.") §§ 10-2201 to –2249 (2004).

2. Although not at issue in this matter, the trial court also found invalid § 3(b) of the Agreement, governing "Retirement" of a stockholder. This provision initially required that RSCE repurchase a Stockholder's Share upon his or her retirement. However, it required a Stockholder who had retired and then resumed the private practice of law within five years to repay RSCE any amounts received for that Share, plus 10% interest.

¶ 9 The trial court held that Fearnow was a "disqualified person" under the Act and ordered the appraisal of his share. RSCE filed a motion for reconsideration on the "disqualified person" issue, which the court denied.

¶ 10 The valuation issue proceeded to a bench trial before the Honorable Anna Baca. The court determined that the fair value of Fearnow's equity interest was $86,500. The court entered final judgment to that effect, and awarded the Fearnows their attorneys' fees, expert fees and costs. RSCE timely filed this appeal. We have jurisdiction over this matter pursuant to A.R.S. § 12–2101(B)(2003).

## DISCUSSION

¶ 11 On appeal, RSCE challenges the trial court's partial summary judgment rulings regarding both the invalidity of the Shareholder Agreement and Fearnow's status as a "disqualified person" under the Act. We review the grant of summary judgment *de novo*, viewing the evidence and any reasonable inferences therefrom in the light most favorable to the party against whom judgment was entered. *Great Am. Mortg., Inc. v. Statewide Ins. Co.*, 189 Ariz. 123, 124–25, 938 P.2d 1124, 1125–26 (App.1997). Also, the interpretation of a contract involves questions of law which we review *de novo*, as we do the interpretation and construction of the ethical rules governing attorney conduct. *Tobel v. Travelers Ins. Co.*, 195 Ariz. 363, 366, ¶ 13, 988 P.2d 148, 151 (App.1999) (interpretation of contract is subject to *de novo* review); *Perguson v. Tamis*, 188 Ariz. 425, 427, 937 P.2d 347, 349 (App.1996) (interpreta-

tion and meaning of court rule is question of law subject to *de novo* review).

## I

■ ¶ 12 We first consider whether the Shareholder Agreement is enforceable. The trial court concluded that section 3(c) of the Shareholder Agreement was an unlawful restriction on the right of Fearnow to practice law and therefore, in violation of ER 5.6(a). At the time of the trial court proceedings, ER 5.6(a) provided:

Restrictions on Right to Practice
A lawyer shall not participate in offering or making:
(a) a partnership[ 3] or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship except an agreement concerning benefits upon retirement;....

ER 5.6.[4]

■ ¶ 13 The ethical rule guarding against restrictive covenants among lawyers was created to "prevent[ ] lawyers from 'bartering in clients,' thereby protecting the client's freedom to choose, discharge, or replace a lawyer at will." *Anderson v. Aspelmeier, Fisch, Power, Warner & Engberg*, 461 N.W.2d 598, 601 (Iowa 1990) (citations omitted); *see also* Cmt. [1] to 2003 Amendment to ER 5.6 ("An agreement restricting the right of lawyers to practice after leaving a firm not only limits their professional autonomy but also *limits the freedom of clients to choose a lawyer*.") (emphasis added).

¶ 14 Arizona courts have not directly addressed ER 5.6's prohibition on restrictive covenants. However, in *Valley Medical Specialists v. Farber*, 194 Ariz. 363, 982 P.2d 1277 (1999),[5] a case invalidating a restrictive

---

3. ER 1.0 defines "partner" as both a member of a partnership and a shareholder in a law firm organized as a professional corporation. Rule 42, Ariz. R. Sup.Ct.

4. Subsection (a) of ER 5.6 was amended on June 9, 2003, effective December 1, 2003, to read:

A lawyer shall not participate in offering or making:
(a) a partnership, shareholders, operating, employment, or other similar type of agreement that restricts the right of a lawyer to practice after termination of the relationship, except an

agreement concerning benefits upon retirement....

5. In *Valley Medical*, the Arizona Supreme Court analyzed a restrictive covenant between Steven Farber, a doctor, and the professional corporation where he worked, Valley Medical Specialists ("Valley Medical"). That covenant precluded Dr. Farber from competing with Valley Medical for three years within a five mile radius of any of the corporation's offices, and also prohibited him from asking any present or future patients of Valley Medical to leave Valley Medical, from disclosing the identity of those patients to other

covenant between a doctor and his professional corporation, our supreme court analogized the medical profession and a patient's right to the doctor of his/her choice to the legal profession and a client's right to the attorney of his/her choice. *Id.* at 368–69, ¶¶ 16–18, 982 P.2d at 1282–83 (noting that the principle of protecting client choice justified prohibiting restrictive covenants among lawyers). The court concluded that public policy required that the special doctor-patient relationship, like the attorney-client relationship, was entitled to unique protection, and could not be unduly restricted. *Id.* at 369, ¶ 19, 982 P.2d at 1283.

¶ 15 Several jurisdictions have held that *any* financial disincentive imposed upon a departing lawyer is an invalid restriction on the right to practice law in violation of applicable ethical rules. *See Dowd & Dowd, Ltd. v. Gleason,* 181 Ill.2d 460, 230 Ill.Dec. 229, 693 N.E.2d 358 (1998); *Anderson,* 461 N.W.2d 598; *Cohen v. Lord, Day & Lord,* 75 N.Y.2d 95, 551 N.Y.S.2d 157, 550 N.E.2d 410 (1989). The rationale of this position is that ethical rules prevent *any* restrictions by lawyers that limit the ability of a person to choose his or her attorney. *Cohen,* 551 N.Y.S.2d 157, 550 N.E.2d at 411–12; *see also* Restatement (Third) of Law Governing Lawyers § 13 cmt. b (2000).

¶ 16 Meanwhile, other jurisdictions have adopted a more permissive approach, holding that reasonable financial penalties for departing lawyers do not restrict the lawyer's right to practice. *See Howard v. Babcock,* 6 Cal.4th 409, 25 Cal.Rptr.2d 80, 863 P.2d 150, 156 (1993); *Pettingell v. Morrison, Mahoney & Miller,* 426 Mass. 253, 687 N.E.2d 1237, 1240 (1997). Under this approach, financial penalties are enforceable when they are rea-

sonably linked to the actual loss suffered by the firm that is attributable to the lawyer's departure. *Howard,* 25 Cal.Rptr.2d 80, 863 P.2d at 156 (restriction valid if a "reasonable cost against a partner who chooses to compete with his or her former partners"); *Pettingell,* 687 N.E.2d at 1240 (financial penalty valid if "reasonable recognition of a law firm's loss due to the departure of a partner").

¶ 17 In the instant case, however, we need not decide which standard applies in Arizona because the subject financial penalty provision is invalid under even the more permissive standard. The financial disincentive here was not based upon any actual loss suffered by RSCE due to Fearnow's departure. On the contrary, the Agreement required Fearnow to forfeit *all* of his capital contribution regardless of whether he actually took with him any of RSCE's clients.[6] We, therefore, affirm the trial court's holding that the Agreement is unenforceable.

## II

¶ 18 Next, we turn to the issue of compensation. Both parties agree that Fearnow was properly issued his share. According to RSCE, Fearnow must now return his share without compensation. However, having concluded that the Agreement is unenforceable as being against public policy, we decline to so hold.

¶ 19 Fearnow, on the other hand, argues that RSCE is required to compensate him for his share. On appeal, he asserts two theories of recovery. First, he maintains that the Act entitles him to the fair market value of his share. Alternatively, in the event his position under the Act fails, he

Valley Medical competitors, and from providing medical care to any of Valley Medical's former patients. *Id.* at 365, ¶ 3, 982 P.2d at 1279. The agreement allowed Valley Medical to obtain an injunction against Dr. Farber, as well as liquidated damages, for any violation of those restrictions. *Id.* Accordingly, the agreement restricted Dr. Farber's right to practice medicine.

6. RSCE also argues that Fearnow cannot claim a breach of the Ethical Rules in order to avoid a contractual obligation that he advocated, and from which he benefitted. Even accepting that as true, however, we refuse to enforce a contract

that is void as against public policy. *Western Corrections Group, Inc. v. Tierney,* 208 Ariz. 583, 589, ¶ 24, 96 P.3d 1070, 1076 (App.2004). Our refusal to do so is in line with other jurisdictions. *See White v. Medical Review Consultants, Inc.,* 831 S.W.2d 662, 665 (Mo.Ct.App.1992)(refusing defense of estoppel and unclean hands in action invalidating lawyer contract under ER 5.6); *Cohen,* 75 N.Y.2d 95, 551 N.Y.S.2d 157, 550 N.E.2d 410(invalidating agreement for public policy reasons even though plaintiff had accepted benefits of agreement for years).

posits that he is entitled to the return of his capital contribution under the theory of unjust enrichment. We, however, disagree with both of his arguments.

### Arizona Professional Corporation Act

¶ 20 Fearnow first contends that the repurchase of his share pursuant to the Act is mandated by the Supreme Court's opinion in *Vinall v. Hoffman,* 133 Ariz. 322, 651 P.2d 850 (1982). *Vinall* dealt with the departure of a dentist from a professional corporation. The court concluded that the Act required the corporation to repurchase the share of the departing dentist. *Id.* at 324, 651 P.2d at 852.

¶ 21 *Vinall,* however, is no longer controlling. *Vinall* was based on an earlier version of the Act that required the acquisition of a shareholder's shares upon, *inter alia,* the "resignation" or "legal disqualification" of a shareholder. A.R.S. § 10–909(D) (1995).[7] That version of the Act, however, was repealed effective January 1, 1996, and a new Act went into effect on that same date. Thus, the language of the former A.R.S. § 10–909(D) was replaced with A.R.S. § 10–2223, which remains in effect. The former provision that a shareholder's resignation obligated a corporation to acquire the shares was specifically deleted from the new Act. *See* A.R.S. § 10–2223.

¶ 22 Under the current Act, a professional corporation must repurchase the shares of a shareholder upon either of two circumstances: (1) the death or dissolution of the shareholder when the person to whom the shares would be devolved is not a person eligible to hold that stock pursuant to A.R.S. § 10–2220; or (2) when the shareholder becomes a "disqualified person." *Id.* The first circumstance clearly is inapplicable here. Therefore, under the new version of the Act, Fearnow is entitled to the fair market value of his share only if he is a "disqualified person."

¶ 23 The Act now defines a "disqualified person" as "an individual or entity that is not or ceases to be a qualified person." A.R.S. § 10–2201(1). "Qualified person" is defined as "a person that is eligible under the chapter to be issued shares by a professional corporation." A.R.S. § 10–2201(7). Eligibility for the issuance of shares from a professional corporation is set forth in A.R.S. § 10–2220(A)(1), which states that a professional corporation may issue shares to "[i]ndividuals who are licensed by law in this or another state to render a professional service described in the corporation's articles of incorporation." Therefore, because Fearnow is a licensed attorney, he is eligible to be issued shares by the law firm and is a "qualified person" under the current Act. *See Lake Havasu City v. Mohave County,* 138 Ariz. 552, 555, 675 P.2d 1371, 1374 (App.1983) (court must give meaning to clear and unambiguous statutory language). Furthermore, Fearnow will remain a qualified person for so long as he is licensed to practice law in Arizona or in another state. Consequently, at this time, he cannot require that RSCE repurchase his shares on the basis that he is "disqualified" under the Act.

¶ 24 We note that Arizona's current Act was patterned after the 1984 Model Professional Corporate Supplement to the Model Business Corporation Act ("Model Act Supplement"), which supports our analysis. Terence Thompom, et al, 7 Arizona Practice Series–Corporate Practice at 631 (2004 ed.). Section 3(1) of the Model Act Supplement defines a "disqualified person" as "an individual or entity that for any reason is or becomes ineligible under this Supplement to be issued shares by a professional corporation." Section 3(8) defines a "qualified person" as "an individual ... that is eligible under the Supplement to be issued shares by a profes-

---

7. A.R.S. § 10–909(D) provided:

> Within ninety days following the death, insanity, bankruptcy, retirement, resignation, expulsion or other legal disqualification of a shareholder, all of the shares of such shareholder shall be transferred to or acquired by persons qualified to own such shares or by the corporation. Until such transfer is effected such shares shall not be entitled to be voted. Either in its articles of incorporation or its bylaws, the corporation shall fix the price or method of computing the same together with the schedule of payment therefor, for acquiring such shares, in the event the shares are not otherwise acquired within said ninety days by person qualified to own the same.

sional corporation." The official comment clarifies that the "Supplement permits shares of a professional corporation generally to be issued only to individuals licensed in this or another state to render a professional service." Model Act Supplement § 3, official cmt. 1. The official comment further states that "[t]hese persons are referred to as 'qualified persons.' " *Id.* Consequently, the only shareholder limitation found in the new Model Act is that the shareholder be licensed in the related profession.

¶ 25 We further note that a significant goal of every uniform act, including this one, is to foster uniform interpretations by all states that adopt it. *See Canon School Dist. No. 50 v. W.E.S. Const. Co. Inc.,* 180 Ariz. 148, 154, 882 P.2d 1274, 1280 (1994) (declaring that "[u]niform Acts should be interpreted consistently," and quoting the Tennessee Supreme Court, which stated that "[i]t is axiomatic that a purpose in enacting uniform laws is to achieve conformity, not uniqueness.... This court should strive to maintain the standardization of construction of uniform acts to carry out the legislative intent of uniformity," *Holiday Inns, Inc. v. Olsen,* 692 S.W.2d 850, 853 (Tenn.1985)); *Welch–Doden v. Roberts,* 202 Ariz. 201, 209, ¶¶ 33, 34, 42 P.3d 1166, 1174 (App.2002) (ruling consistent with the interpretation of other jurisdictions adopting the Uniform Child Custody Jurisdiction and Enforcement Act, which was intended to reduce the potential of "conflicting jurisdictional disputes"). Accordingly, states should be able to enact laws patterned after model acts with the assurance that the same language enacted by different states will be similarly interpreted to reach similar results. Our conclusion is therefore bolstered by the conclusions reached by all courts that have considered the term "disqualified" under the Act.

¶ 26 For example, in Utah a plaintiff-attorney was fired by her firm. *Berrett v. Purser & Edwards,* 876 P.2d 367, 368 (Utah 1994). She then requested that the firm repurchase her shares in the professional corporation because, she alleged, she was no longer "qualified" to hold corporate shares. *Id.* The Utah Supreme Court, however, held that the Utah statute referred only to individuals who were no longer licensed in the corporation's profession. *Id.* at 369. The court concluded that the phrase "no longer qualified" did not refer to an employee whose employment relationship had been terminated, but who still was appropriately licensed. *Id.* at 370. The court gave the term "qualified" "its logical and consistent meaning within the entire Professional Corporation Act," noting that if the court added to that meaning it would be exceeding its authority and legislating from the bench. *Id.* Moreover, in response to the plaintiff's claim that deeming her to be "qualified" to own shares would result in unethical ramifications, the court opined that such concerns could not alter the statute's meaning and that such employee-shareholders must take responsibility for their own failure to protect themselves in the event of termination from their firm. *Id.* at 371.

¶ 27 In a similar case in Florida, three attorneys, who all held shares in the same professional corporation, voluntarily discontinued employment with their firm. *Corlett, Killian, Hardeman, McIntosh and Levi, P.A. v. Merritt,* 478 So.2d 828, 829 (Fla.Dist. Ct.App.1985). The court held that the Act did not require that the professional corporation repurchase the shares of its former employees. *Id.* Thus, the former employees could remain shareholders in the professional corporation. *Id.* at 831. The Florida court, like the Utah court in *Berrett,* held that employee-shareholders could not look to the court for redress if they had failed to protect themselves from ethical difficulties that might arise from their continued ownership of stock in the professional corporation following the termination of their employment. *Id.* at 834.

¶ 28 Again, in Illinois, the appellate court opined that the state's Professional Service Corporation Act, which required a corporation to repurchase the shares of a shareholder who was "no longer qualified," simply referred to shareholders who were no longer licensed in the profession and did not include those shareholders who were still licensed but whose employment relationship with the professional corporation had terminated. *Trittipo v. O'Brien,* 204 Ill.App.3d 662, 149 Ill.Dec. 505, 561 N.E.2d 1201, 1204–05 (1990).

The court also commented that pursuant to the Act, licensed shareholders were not obligated to practice their profession at all; they were merely required to be licensed. *Id.* 149 Ill.Dec. 505, 561 N.E.2d at 1205. Hence, because the plaintiff-attorney remained licensed to practice law, the applicable statute did not require that the law firm purchase his shares. *Id.* Finally, the court also commented that possible ethical difficulties did not warrant unauthorized court intervention. *Id.* 149 Ill.Dec. 505, 561 N.E.2d at 1208.

¶ 29 We, too, recognize that the result in the instant case may expose the parties to risks of ethical improprieties; but that does not empower this court to ignore the clear language of the current Act. It simply is not our duty to legislate. *See In re B.S.,* 205 Ariz. 611, 618, ¶ 31, 74 P.3d 285, 292 (App. 2003) (court cannot add statutory requirements); *State ex rel. Lassen v. Harpham,* 2 Ariz.App. 478, 487, 410 P.2d 100, 109 (1966) (court may not "judicially legislate" by adding provisions to a statute). Although another result might be preferable, given the legislative history and the plain statutory language before us, our conclusion is mandated. *See Cohen v. State,* 121 Ariz. 6, 9, 588 P.2d 299, 302 (1978) ("[A] court should avoid legislating a particular result by judicial construction.").[8]

### Unjust Enrichment

■■ ¶ 30 Fearnow's alternative theory of recovery, unjust enrichment, also fails. "Unjust enrichment occurs when one party has and retains money or benefits that in justice and equity belong to another." *Trustmark Ins. Co. v. Bank One, Ariz., N.A.,* 202 Ariz. 535, 541, ¶ 31, 48 P.3d 485, 491 (App.2002). In the present case, RSCE has not been unjustly enriched.

¶ 31 Here, RSCE has not retained anything that belongs to Fearnow. Fearnow still owns his share in the professional corporation. Accordingly, he may exercise all shareholder rights afforded by the Professional Corporation Act. *See* A.R.S. § 10–2202; A.R.S. §§ 10–001 to –1702 (2004). Although Fearnow's share may be less valuable now that he has left the firm,[9] he cannot claim that he is left with fewer shareholder rights.

### CONCLUSION

¶ 32 For the foregoing reasons, we affirm the trial court's ruling that the Shareholder Agreement is void, but reverse the order requiring that RSCE purchase the share from Fearnow pursuant to the Act.

CONCURRING: MAURICE PORTLEY, Presiding Judge and DONN KESSLER, Judge.

---

8. Of course, nothing prevents a professional corporation from providing for the repurchase of a resigning shareholder's shares. Today we merely hold that there is not a remedy under the Act that provides for the mandatory repurchase of such shares as long as the departing shareholder remains licensed.

9. Fearnow may "well be left in the unfortunate position of owning unmarketable shares of stock," but this is "generally true of the minority shareholders in all close corporations." *Corlett,* 478 So.2d at 834.