Barbara K. **BERRETT**, Plaintiff and Appellant,

v.

**PURSER & EDWARDS**, fka Purser & Berrett, a Utah professional corporation, Defendant and Appellee.

No. 930341.

Supreme Court of Utah.

June 2, 1994.

R. Brent Stephens, Ryan E. Tibbitts, Salt Lake City, for plaintiff.

Jesse C. Trentadue, Claudia F. Berry, Dahnelle B. Doyle, Salt Lake City, for defendant.

HOWE, Justice:

Plaintiff Barbara K. Berrett brought this suit under Utah Code Ann. § 16–11–13 to compel her former employer, a professional corporation, to repurchase her shares in the corporation or, in the alternative, to have the court dissolve and liquidate the corporation. The trial court dismissed her complaint for failing to state a claim upon which relief could be granted. Utah R.Civ.P. 12(b)(6). She appeals.

Berrett, a licensed attorney, is a shareholder in and was employed by a law firm formerly known as Purser & Berrett and currently known as Purser & Edwards.

The firm terminated her employment, and she now works for another law firm; however, she still owns her shares in Purser & Edwards. As she did with her old firm, Berrett practices mainly in insurance defense law with her new firm. Nothing in the articles of incorporation or bylaws of Purser & Edwards addresses the disposition of shares when a shareholder is no longer an employee, nor did Berrett have a private employment agreement dispositive of that question. On review, we accept the factual allegations in Berrett's complaint as true, and we draw all reasonable inferences in a light most favorable to her. *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 196 (Utah 1991).

■ Section 16–11–13 of the Professional Corporation Act provides for the redemption of shares in a professional corporation. It states in part:

The articles of incorporation may provide for the purchase or redemption of the shares of any shareholder upon the death or *disqualification* of such shareholder, or the same may be provided in the bylaws or by private agreement. In the absence of such a provision in the articles of incorporation, the bylaws, or by private agreement, the professional corporation shall purchase the shares of a deceased shareholder or a shareholder *no longer qualified to own shares* in such corporation within 90 days after the death of the shareholder or *disqualification* of the shareholder, as the case may be. The price for such shares shall be their reasonable fair value as of the date of death or *disqualification* of the shareholder. If the corporation shall fail to purchase said shares by the end of said 90 days, then the executor or administrator or other personal representative of a deceased shareholder or any *disqualified* shareholder may bring an action in the district court of the county in which the principal office or place of practice of the professional corporation is located for the enforcement of this provision. The court shall have power to award the plaintiff the reasonable fair value of his shares, or within its jurisdiction, may order the liquidation of the corporation.

Utah Code Ann. § 16–11–13 (emphasis added). Berrett alleges that she is "no longer qualified to own shares" in the professional corporation of Purser & Edwards. Her argument assumes that "qualified," under the statute, means no longer employed by that corporation. Purser & Edwards argues for a narrower interpretation, i.e., that "qualified" means only duly licensed in the particular profession and since Berrett is still a licensed attorney, she is not "disqualified" and cannot force repurchase of her shares.

The legislature has not provided specific definitions of "qualified" and "disqualified" in the Professional Corporation Act. *See* Utah Code Ann. §§ 16–11–1 to –15. In *Riche v. North Ogden Professional Corp.*, 763 P.2d 1210 (Utah Ct.App.1988), *aff'd mem.*, 784 P.2d 1126 (Utah 1989), the court of appeals examined the involuntary transfer of shares in a medical corporation from a bankrupt shareholder to a nonprofessional creditor of that shareholder. In upholding the transfer, the court provided insight into section 16–11–13 and, specifically, into the terms currently in question: " 'Qualification' and 'disqualification' refer, *in this sense*, to whether a shareholder is qualified to hold stock in the professional corporation, i.e., whether he or she is *duly licensed* as a member of the profession." *Id.* at 1214 n. 7 (emphasis added). It appears that the trial court relied on this language in dismissing Berrett's complaint.

Berrett argues that by employing the language "in this sense," the court of appeals was specifically limiting this statement to the facts of *Riche*. She asserts that whether one is duly licensed in the particular field is merely a threshold question and that she can be disqualified from owning shares even though she is still licensed because she is no longer employed with Purser & Edwards. We believe that by using the phrase "in this sense," the court of appeals was referring to section 16–11–13, not to the specific facts of *Riche*.

The court of appeals explained its rationale in defining "qualified" to mean duly licensed: " [L]egislation extending the power to incorporate to professionals seeks to assure that corporate control will remain with persons' licensed in the profession, and bound by the

same professional standards and ethics, by restricting the sale or transfer of stock to members of the profession." *Id.* at 1213 (quoting *Central State Bank v. Albright*, 12 Kan.App.2d 175, 737 P.2d 65, 67 (1987)). There is nothing in *Riche* suggesting that "qualified" could additionally require an employment relationship.

In determining the scope of the term "qualified" in section 16–11–13, it is helpful to examine preceding sections within the same Act. Indeed, to interpret section 16–11–13, basic rules of statutory construction compel us to look at the Professional Corporation Act in its entirety. *See Morton Int'l, Inc. v. Auditing Div.*, 814 P.2d 581, 591 (Utah 1991) ("[T]erms of a statute are to be interpreted as a comprehensive whole and not in a piecemeal fashion."); *CP Nat'l Corp. v. Public Serv. Comm'n*, 638 P.2d 519, 523 (Utah 1981) (doubtful words are to be determined in light of their association with surrounding words and phrases).

Three preceding sections shed light on who may own shares in a professional corporation. Section 16–11–7 provides:

> A professional corporation may issue the shares of its capital stock only to persons who are *duly licensed* to render the same specific professional services as those for which the corporation was organized. A shareholder may voluntarily transfer his shares in a professional corporation only to a person who is *duly licensed* to render the same specific professional services as those for which the corporation was organized. Any shares issued in violation of this section are void.

Thus, shares may be *issued* only to licensed persons, and those persons may voluntarily *transfer* their shares only to licensed persons. Further, in section 16–11–8, only a licensed person may be an officer, director, or shareholder, and in section 16–11–9, the corporation may render professional service only through licensed officers, employees, and agents. No other requirement to own shares is mentioned in any of these sections, and we should not import any. Thus, when section 16–11–13 conditions the obligation of the professional corporation to buy the shares of a shareholder when he or she is no longer qualified, the word "qualified" unmistakably refers to who may own shares as provided in section 16–11–7.

In *Trittipo v. O'Brien*, 204 Ill.App.3d 662, 149 Ill.Dec. 505, 508–09, 561 N.E.2d 1201, 1204–05 (1990), the court held that the provision of the Illinois Professional Corporation Act which required the redemption of shares when a person is no longer qualified did not apply to a shareholder who voluntarily terminated his employment. Likewise, the court viewed the act as a whole in arriving at this conclusion:

> The first paragraph of section 415–11 limits the issuance of stock in a professional corporation to persons who are duly licensed or otherwise legally authorized to render the specific type of services which the corporation was organized to perform. Nothing in that paragraph requires that the right to be a shareholder is dependent upon the existence of an employment relationship between the shareholder and the corporation.
>
> . . . .
>
> Since licensure or other legal authorization to render the same services the corporation performs is the only qualification stated in the Act to become a shareholder in a professional corporation, a shareholder becomes "disqualified" under the second paragraph of section 415–11 only when he is no longer licensed to practice the profession of the corporation.

*Id.*

In addition, a Florida appellate court has held that a professional corporation engaged in law practice cannot be compelled to redeem shares held by a minority shareholder attorney upon termination of his employment in the absence of a statute, articles of incorporation, or an agreement providing for such relief. *Corlett, Killian, Hardeman, McIntosh & Levi v. Merritt*, 478 So.2d 828, 831 (Fla.Dist.Ct.App.1985). Like the Utah Professional Corporation Act, the Florida statutory scheme pertaining to corporations lacked any provisions which imposed "a duty upon the corporation to redeem the shares of a terminated corporate employee." *Id.* at 829. The Florida court refused to exercise

its "equitable" powers to order redemption or dissolve the corporation. *Id.* at 832. Instead, it determined that "while a shareholder may be an employee of the corporation, he need not be: the relationships of the corporation to its employees and to its shareholders are distinct." *Id.* at 830 n. 5; *see Early Detection Ctr., Inc. v. Wilson,* 248 Kan. 869, 811 P.2d 860, 865 (1991) (stating that term "qualified person" under Kansas professional corporation statute meant one licensed to practice in the profession).

In support of her argument, Berrett relies on *Vinall v. Hoffman,* 133 Ariz. 322, 651 P.2d 850, 851 (1982) (en banc), where the Arizona Supreme Court required a professional corporation of dentists to repurchase the shares of a stockholder who had resigned from practicing with the corporation. However, the repurchase statute interpreted in that case was worded markedly different from section 16–11–13. It provided:

"Within ninety days following the death, insanity, bankruptcy, retirement, resignation, expulsion or other legal disqualification of a shareholder, all of the shares of such shareholder shall be transferred to or acquired by persons qualified to own such shares or by the corporation."

*Vinall,* 651 P.2d at 851 (quoting Ariz.Rev. Stat.Ann. § 10–909(D)). Thus, the Arizona court had a much broader statute before it than we do with section 16–11–13. The court interpreted "resignation" to mean resignation from the professional corporation rather than from the profession, and based on that interpretation, the duty to repurchase was clear. *Id.*

■ A cardinal rule of statutory construction is that courts are not to infer substantive terms into the text that are not already there. Rather, the interpretation must be based on the language used, and the court has no power to rewrite the statute to conform to an intention not expressed. *Mountain States Tel. & Tel. Co. v. Public Serv. Comm'n,* 107 Utah 502, 155 P.2d 184, 185 (1945); *see Trittipo,* 149 Ill.Dec. at 507, 561 N.E.2d at 1203 ("The statute should be interpreted on the basis of what was written, and courts should not search for any subtle or not readily apparent intention of the legisla-

ture."). To accept Berrett's interpretation would require us to change the existing language and meaning of sections 16–11–7, –8, and –9 in order to maintain consistency throughout the entire Act. To require an employment relationship would amount to our reading substantive terms into section 16–11–13 which the legislature did not see fit to include.

Section 16–11–13 affords minimum protection to shareholders when they fail to otherwise provide. If we adopted Berrett's interpretation that being duly licensed is simply a threshold requirement and that "qualified" can also mean employment with Purser & Edwards, we would embark down a road of uncertainty. The term "qualified to own shares" would be limited only by the imagination of shareholders seeking redemption by the professional corporation. If someone is a poor attorney, is he or she disqualified from owning shares? If the working relationship breaks down between shareholders of a professional corporation, are they "no longer qualified to own shares"? What if they move out of the state in which they are licensed to practice? These questions must find their answers in private employment agreements, articles of incorporation, or bylaws rather than in the minimum protection provided by section 16–11–13. We therefore limit the definition of "qualified" to its logical and consistent meaning within the entire Professional Corporation Act. Anything beyond that would constitute judicial legislation and the assumption of powers beyond those of this court.

Finally, Berrett contends that if she has no cause of action under section 16–11–13 to force redemption of her shares, she may be compelled as a shareholder in a competing law firm to violate several ethical rules. First, she expresses concern that if she remains a shareholder in Purser & Edwards, she could possibly receive a dividend from that firm that would constitute illegal fee splitting among lawyers in violation of rule 1.5 of the Utah Rules of Professional Conduct. Second, she asserts that as a shareholder in Purser & Edwards, she is entitled to inspect and copy certain information of the firm, including minutes of its shareholder

meetings. This, she contends, would violate rule 1.6, which requires client confidentiality. Third, she argues that since her new firm also specializes in insurance defense, she will most likely find herself litigating against clients of Purser & Edwards. She urges that this would violate rule 1.8, which mandates withdrawal in cases where a lawyer holds a pecuniary interest.

It is true that a professional corporation which is also a law firm has unique ethical obligations and concerns due to the rules of professional responsibility. However, all of Berrett's ethical concerns are hypothetical, and we will not allow them to dictate our statutory interpretation. We have already determined that section 16–11–13 does not mandate redemption of shares when a shareholder leaves the employment of a professional corporation. We will not alter this legal analysis and construe the statute otherwise because of conjectural ethical predicaments.

*Corlett* addressed similar issues, and the court was unpersuaded that these ethical concerns should "impose a requirement of redemption upon every professional service corporation (or its majority shareholder) engaged in the practice of law." *Corlett,* 478 So.2d at 833.

> In our view, none of the ethical dilemmas or "[a]bsurdities [which] could result because of this unique position" ... are so compelling as to warrant a court-imposed redemption obligation on the part of the corporation.... Likewise, that an ex-employee's shares may fall into or be in the hands of an attorney hostile to the law firm, or that ex-employees may own shares in more than one professional service corporation at the same time, are matters not before us, and while they might justify action by the Florida Bar, do not justify a court compelling redemption.

*Id.* at 834 (quoting *Vinall,* 651 P.2d at 852).

If and when Berrett's ethical problems arise, they can be dealt with at that time. They may impact Purser & Edwards as well as Berrett. We concur with the court in *Trittipo* "that the failure to compel the redemption of [her] share may produce harsh results and the potential for ethical problems.

It [is] our belief, however, that these concerns do not justify unauthorized judicial intervention." *Trittipo,* 149 Ill.Dec. at 512, 561 N.E.2d at 1208. Hopefully, possible ethical problems will motivate both attorneys and law firms to provide by agreement, article, or bylaw for the disposition of shares in case of employment termination. "Where an employee who purchases such shares for valuable consideration either lacks the foresight or the bargaining power to insist upon a redemption agreement in the event of his resignation, it is not incumbent upon the courts to protect him from his own improvidence or lack of strength." *Corlett,* 478 So.2d at 834. Any ethical violation that might arise will be the result of an attorney's own failure to provide for the specific disposition of shares in case of termination from the law firm. Agreements forestalling these possible violations are not uncommon. *See id.* at 831.

We affirm the trial court's dismissal of Berrett's complaint.

ZIMMERMAN, C.J., and JAMES Z. DAVIS, Court of Appeals Judge, concur.

STEWART, Associate Chief Justice, dissenting:

In construing the Utah Professional Corporation Act, the majority ignores critical language in § 16–11–10, misconstrues carefully drafted language in § 16–11–13, and reaches a result that is antithetical to the legislative intent of accommodating a modified corporate form of doing business with important ethical constraints on professional persons who use that form of doing business. The majority holds that a professional person has no right under § 16–11–13 to redeem his or her shares upon termination of the professional relationship with the corporation. Shareholders who have been terminated from practicing in such a corporation are thereby relegated to the role of "passive" shareholders, and their financial interest in the corporation is frozen indefinitely. More important, the majority's position creates unavoidable and serious ethical problems for both professionals and professional corporations.

Section 16–11–13 of Utah's Professional Corporation Act governs this case. It provides that "the professional corporation shall purchase the shares of a deceased shareholder *or a shareholder no longer qualified to own shares in such corporation.*" (Emphasis added.) The majority incorrectly reads the phrase "shareholder no longer *qualified*" to mean "shareholder *no longer licensed.*" A careful analysis of the Act compels the conclusion that the Legislature knowingly and intentionally used the term *"no longer qualified"* rather than the term "no longer licensed" for important reasons. At bottom, the majority's error lies in changing the meaning of the statutory term "shareholder ... disqualified" to "shareholder ... unlicensed" and then, ironically, in declaring that the Court has no power "to read into the Act" a substantive term. That substantive term was put in § 16–11–13 when the Legislature used the term "disqualified" instead of "unlicensed."

## I. HISTORY OF PROFESSIONAL CORPORATION ACTS

The history of professional corporation statutes sheds significant light on the legislative purpose behind the Utah Professional Corporation Act and how professional corporations differ from business corporations. Professionals traditionally practiced either as solo practitioners or in partnerships but not as corporations because of ethical standards inconsistent with a corporate form of doing business. As a consequence, professionals were denied a wide variety of federal and state tax benefits available to others who could incorporate. For example, professional practitioners could not deduct various business expenses from gross income or avail themselves of various retirement programs and other benefits entitled to favorable tax treatment under federal law. Such benefits were, however, available to other persons who provided personal services to the public and who were able to adopt a corporate form of business.

To obtain tax equality without violating the ethical standards of the various licensed professions, members of some professions began to form professional "associations," which were intended to obtain the benefits of corporate status, but only for tax purposes. *See United States v. Empey,* 406 F.2d 157, 167 (10th Cir.1969). The watershed case from the federal tax perspective is *United States v. Kintner,* 216 F.2d 418 (9th Cir.1954). In that case, a group of doctors who had organized a noncorporate "association" to practice medicine were accorded corporate status for federal tax purposes. *Id.* at 428. In 1957, the IRS Commissioner acquiesced in that ruling and agreed to allow professional associations to be taxed as corporations. *See* Rev.Rul. 57–546, 1957–2 C.B. 886. The Treasury Department, however, attempted to overrule *Kinter* by promulgating rules providing that professional entities should be treated as partnerships, not as corporations. *Empey,* 406 F.2d at 167–68. The Department's motive in seeking to overrule *Kintner* was so transparent that the regulations it promulgated were generally referred to as the "Kintner Regulations." *Id.* at 168.

In response to the Kintner Regulations, professional practitioners lobbied state legislators nationwide to enact statutes that would permit professionals to organize in a modified corporate form that would be recognized as a corporation for tax purposes while leaving professional ethical standards intact. Note, *Professional Corporations & Associations,* 75 Harv.L.Rev. 776–79 (1962). Although the IRS agreed to treat professional corporations created under state laws as corporations for federal tax purposes, Rev.Rul. 70–101 (1970), those corporations were fundamentally and significantly different from general business corporations. For example, personal liability of shareholders for negligence was not limited by the corporate form.

Thus, a professional corporation is by necessity a hybrid of the business corporate form and the partnership form of doing business. *Vinall v. Hoffman,* 133 Ariz. 322, 651 P.2d 850, 851 (1982) (en banc); *see also* Utah Code Ann. §§ 16–11–3, –7, –10. The professional corporation act had "to accommodate the special needs of the professional who chooses to associate and practice his or her profession," because the corporate aspects of the professional corporation were simply to allow "professionals to take advantage of var-

ious federal tax provisions available to a corporation and its employees but not available to self-employed persons or partnerships." *Vinall,* 651 P.2d at 851.

## II. UTAH PROFESSIONAL CORPORATION ACT

Utah enacted its Professional Corporation Act in 1963. Utah Code Ann. §§ 16–11–1 to –15 (1991 & Supp.1993). The legislative purpose of the Act, consistent with the brief history outlined above, is to allow professionals in eighteen professions "the benefits of the corporate form for the *business aspects of their practices while preserving the established professional aspects of the professional relationship between the professional person and those he serves.*" Utah Code Ann. § 16–11–3 (emphasis added). Professional corporation acts generally, and the Utah Act specifically, were not intended to make a professional corporation the legal equivalent of a business corporation.

The provisions of the Utah Act make explicit a number of fundamental differences between commercial and professional corporations. A professional corporation may not raise capital by issuing shares to investors or to the public generally. Shareholders in a professional corporation can only be "persons who are duly licensed to render the same specific professional services as those for which the corporation was organized." Utah Code Ann. § 16–11–7. In addition, a professional corporation may render "one specific type of professional service and services ancillary thereto," but may not otherwise engage in general business activities. Utah Code Ann. § 16–11–6. Thus, a professional corporation may not be used to manufacture products or provide banking or investment services or any other kind of personal service that is not professional in nature and of the specific type for which it was organized.

The purposes for which a professional corporation may be created are highly limited. Section 16–11–6 of the Code provides:

A professional corporation may be organized pursuant to the provisions of this act *only for the purpose of rendering one specific type of professional service and services ancillary thereto and shall not en-*gage in any business other than rendering the professional service which it was organized to render and services ancillary thereto; provided, however, that a professional corporation may own real and personal property necessary or appropriate for rendering the type of professional service it was organized to render and may invest its funds in real estate, mortgages, stocks, bonds and any other type of investments.

(Emphasis added.) Under § 16–11–9, the professional services provided by the corporation may be offered only by a duly licensed person: "A professional corporation may render professional services only through its officers, employees and agents who are duly licensed to render such professional services."

A crucial provision in the proper construction of the Act is § 16–11–10. It provides that the law governing professional relationships, including but not limited to the law of personal liability of professionals, was not intended to be altered by the terms of the Act, notwithstanding general business law concepts that would otherwise govern. Section 16–11–10 provides, *"This act does not alter any law applicable to the relationship between a person rendering professional services and a person receiving such services, including liability arising out of such professional services."* (Emphasis added.)

Thus, section 16–11–10 of the Act specifies that a professional corporate form of business cannot be used to violate "established professional aspects of the professional relationship." Notwithstanding the primacy of that principle, the majority refuses to construe the Act in light of that principle and dismisses all ethical considerations that will inevitably result from its construction as "hypothetical." In fact, however, the majority opinion itself causes one ethical violation, as discussed below.

Because plaintiff is denied a right to redeem her stock under § 16–11–13, she becomes a passive shareholder in a professional corporation, a status contrary to the intent of the Act. The Act provides that shares may be issued only to licensed professionals.

Utah Code Ann. §§ 16–11–7, –10, –13. As Professor Bittker has stated, the Act does not "contemplate a passive investment in the stock of an association engaged in the practice of law or medicine by a person who, though licensed to practice the profession, is [deceased,] inactive or retired." Boris I. Bittker, *Professional Associations & Federal Income Taxation: Some Questions & Comments*, 17 Tax L.Rev. 1, 17 (1961). A shareholder, like plaintiff, who leaves the corporation and retains her stock is a passive investor who is left "with an ownership interest in a professional corporation where [she] no longer works, where [she] no longer is notified of meetings or policy decisions, from which [she] no longer gets reports, and where [she] is no longer permitted to vote [with respect to the conduct of the business, or against the directors]." *Vinall v. Hoffman*, 133 Ariz. 322, 651 P.2d 850, 852 (1982) (en banc) (construing a similar redemption provision in the Arizona professional corporation act).

The section that specifically governs the instant case is § 16–11–13. It is intended to prevent a corporation from having passive shareholders. It states:

The articles of incorporation may provide for the purchase or redemption of the shares of any shareholder upon the death or disqualification of such shareholder, or the same may be provided in the bylaws or by private agreement. In the absence of such a provision in the articles of incorporation, the bylaws, or by private agreement, the professional corporation shall purchase the shares of a deceased shareholder or a shareholder no longer qualified to own shares in such corporation within 90 days after the death of the shareholder or disqualification of the shareholder, as the case may be.

Thus, pursuant to this provision, the corporation is required to purchase shares of a professional who is *"no longer qualified"* to own shares, even if the corporation fails to provide for that in its articles or bylaws or by agreement.

The majority reads the term "disqualified" in § 16–11–13 to mean "unlicensed," even though the Legislature expressly used a term other than "unlicensed" to distinguish between a professional who is licensed, *see* § 16–11–9, and a professional who is "licensed" but "disqualified." The latter term, in the context in which it is used, clearly means a shareholder who may be licensed but is disqualified from owning shares in the corporation. If the term "no longer qualified" were intended to mean "no longer licensed," as the majority holds, the Legislature would have said so; it did not, for compelling reasons.

In *Vinall v. Hoffman*, 133 Ariz. 322, 651 P.2d 850 (1982) (en banc), the Arizona Supreme Court addressed almost the same question that we have here. The critical Arizona statutory language was "resignation" rather than "disqualified." A lower appellate court held, as the majority does here, that the professional corporation act did not provide a dentist shareholder who had resigned as an "employee" of the corporation a statutory right to have his stock redeemed because the statutory right of redemption was triggered by "resigning" *from the profession*, not from the corporation. The Arizona Supreme Court stated that the issue was "whether the Legislature intended for the word 'resignation' ... to mean resignation from a professional corporation or resignation from a profession altogether." *Id.* 651 P.2d at 850. Even though the plaintiff and the other stockholders had entered into an agreement giving the corporation the *option* to buy back a resigning shareholder's shares, an option the corporation declined to exercise, the court held that the court of appeals had erred and that the corporation had a statutory duty to redeem. The court stated that a professional corporation is a "hybrid" corporation that is different from business corporations and ruled that the statutory term "resignation" meant resignation from the corporation, not from the profession. The court reasoned that such a construction was necessary to protect professional ethical standards. The court stated:

To construe the statute as the Court of Appeals did would lead to an illogical result. Under the Court of Appeals' reasoning Dr. Hoffman may very well be left with unmarketable shares of uncertain value.

This leaves Dr. Hoffman with an ownership interest in a professional corporation where he no longer works, where he no longer is notified of meetings or policy decisions, from which he no longer gets reports, and where he is no longer permitted to vote. Dr. Hoffman might also remain liable for the actions of those still practicing in the corporation. Further, professional corporations rarely, unless they have accumulated large capital surpluses, declare dividends. Instead they dispose of most of the profits as salary. Thus, if the Court of Appeals' reasoning was followed, Dr. Hoffman would own an interest in a professional corporation over which he exercises no control and from which he will likely receive no dividends. Absurdities could result because of this unique position.

Our holding requiring a corporation to redeem the shares of the resigning shareholder is equitable to the corporation. Otherwise, a withdrawing shareholder could refuse to sell his or her shares back to the corporation and possibly subject the remaining shareholders to liability for his or her malpractice or negligence *after leaving the corporation* at a time when the corporation has no supervisory control over the practitioner. See A.R.S. § 10–905.

Ethical considerations require the result we reach today. Principle 1—(I) of the *Principles of Ethics and Code of Professional Conduct* of the American Dental Association provides that "Dentists shall not accept or tender 'rebates' or 'split fees.'" See A.R.S. §§ 32–1297.07(A)(1) and 32–1201(10)(n). *In Arizona a professional corporation cannot do what the person licensed to practice cannot do.* A.R.S. § 10–909(A). Although the [Wisconsin] Court of Appeals did not have to reach this precise issue it offered guidance when it stated, "*Ethical considerations may re-*quire when one member of a service corporation voluntarily leaves that service corporation, that he [or she] be compensated at a fair value." Melby v. O'Melia, 93 Wis.2d 51, 55, 286 N.W.2d 373, 375 (App. 1979). *If the corporation paid a dividend to Dr. Hoffman when he did not work there it could be subject to sanctions for splitting a fee for work not performed.*

The Court of Appeals noted that "[i]n ordinary usage, 'resignation' refers to a voluntary, unilateral surrender of an office or position." 133 Ariz. at 332, 651 P.2d at 860. *In applying the rule of common sense meaning in interpreting words we believe the term "resignation" was intended to mean resignation from a professional corporation and not from a profession.* Id., 651 P.2d at 852 (footnote omitted) (emphasis added).

Because of the majority's ruling, Berrett, contrary to her choice, is now a shareholder in two professional corporations where conflicts of interest, fee splitting, and other ethical difficulties are serious possibilities. In addition, an immediate violation of ethical rules occurs because of Berrett's membership in two firms when she practices in only one. Under ABA ethical standards, it is improper for a lawyer to have membership in a firm in which he or she does not actively practice and participate. *See generally Melby v. O'Melia*, 93 Wis.2d 51, 286 N.W.2d 373 (App.1979).[1] "A lawyer may be a partner in two law firms in different states *provided* he actively practices law at both locations." ABA Comm. on Ethics and Professional Responsibility, Informal Op. 83–1499 (1983). While a lawyer may be associated with more than one law firm, a lawyer must (1) "actually practice at both locations"; (2) "avoid all possibility of misleading anyone as to the extent of your activity at each"; and (3) "avoid any activity or relationship [at both locations] that would impair the independent professional judgment to which each client is

---

1. The Rhode Island Supreme Court described the effect of Rhode Island's professional corporation act:

   "In substance, *insofar as the relationship of an attorney and client and of attorney and the general public is concerned,* practice in corporate form will be as we have previously pointed out, substantially similar to the practice of law as it presently exists in firms operating as law partnerships."

   *Melby*, 286 N.W.2d at 374 (quoting *In re Rhode Island Bar Assoc.*, 106 R.I. 752, 763, 263 A.2d 692, 698 (1979)).

entitled." ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1253 (1972) (partnership in more than one firm). A shareholder who terminates employment but who retains shares in a firm cannot comply with that rule.

The result the majority adopts will also propel both Berrett and her former firm into a number of other likely ethical violations. Berrett appears to be a member of her old firm Purser & Edwards in violation of Utah Rule of Professional Conduct 7.5(d), which provides that a lawyer may state or imply that she practices in a law firm only when that is the fact. *See also* Model Code of Professional Responsibility DR 2–102(C). If Berrett is given access to the books, records, and client files of Purser & Edwards to protect her "investment," that might well violate Utah Rule of Professional Conduct 1.6(a), which requires a lawyer to keep her client's confidences. *See also* Model Code of Professional Responsibility DR 4–101(B)(1). In addition, Berrett and Purser & Edwards are likely to violate Utah Rule of Professional Conduct 1.7(a), which prohibits the same firm from representing clients with differing interests. *See also* Model Code of Professional Responsibility DR 5–105(B) & (D). Berrett now practices with a law firm that, like Purser & Edwards, specializes in insurance defense. It is likely that Berrett will represent clients with interests adverse to the majority shareholders at Purser & Edwards. Finally, if Purser & Edwards declares a dividend, it will be in violation of the prohibition against fee splitting with attorneys who are not partners or associates in the same firm. Utah Rule of Professional Conduct 1.5(e); *see also* Model Code of Professional Responsibility DR 2–107.

The majority downplays the importance of these ethical considerations by labeling them "hypothetical," even though § 16–11–10 provides that the ethical rules of all professions should be protected. That prohibits professional corporations from having passive shareholders, even if they are licensed. A correct construction of § 16–11–13 would prevent a number of ethical dilemmas from arising out of the corporate form of business for professionals.

Finally, under the majority's holding, Berrett's assets as represented by her shares, whether contributed as cash up front or as a form of retained earnings that were invested in firm assets, are frozen until she either dies, is disbarred, or retires from the profession. Her shares, as a practical matter, cannot be sold or hypothecated. In effect, she is forced to make her assets available to the active shareholders in her former firm for their use and benefit with no compensation.

In my view, the majority's interpretation of the term "no longer qualified to own shares" eviscerates a major principle underlying the Utah Professional Corporation Act. Neither professions, clients, patients, nor shareholders are well served by the result in this case.

I dissent.

DURHAM, J., concurs in the dissenting opinion of STEWART, Associate C.J.

JAMES Z. DAVIS, Court of Appeals Judge, sat to fill the vacancy on the court.