# Supreme Court of Texas

No. 21-1014

David A. Skeels,

*Petitioner*,

v.

Jonathan T. Suder; Michael T. Cooke; and Friedman, Suder & Cooke, P.C.,

*Respondents*

On Petition for Review from the
Court of Appeals for the Second District of Texas

**Argued February 23, 2023**

JUSTICE DEVINE delivered the opinion of the Court, in which Justice Boyd, Justice Blacklock, Justice Busby, Justice Bland, Justice Huddle, and Justice Young joined.

CHIEF JUSTICE HECHT filed a dissenting opinion.

Justice Lehrmann did not participate in the decision.

The central issue in this declaratory-judgment suit is whether a corporate resolution authorized a law firm to redeem a departing

shareholder's shares on terms unilaterally set by the firm's founders.[1] Corporate shares are personal property,[2] but a professional corporation may redeem them if the redemption price and other terms are (1) "agreed to between the board of directors" and either "the shareholder" or his "personal representative,"[3] (2) "specified in the governing documents" or "an applicable agreement,"[4] or (3) determined according to a statutorily authorized "shareholders' agreement."[5]

Here, the firm's governing documents did not address redemption, and after the firm terminated a shareholder's employment, he did not agree to the founders' proposed redemption terms. The founders then purported to redeem his shares at no cost, arguing that a resolution generally authorizing the founders "to take affirmative action on behalf of the Firm" unambiguously encompasses redemption. The trial court agreed, and the court of appeals affirmed, concluding that the resolution's "broad language allowed the [founders] to set the terms of any share redemption as [they] saw fit."[6]

We reverse. By modifying "affirmative action" with "on behalf of the Firm," the resolution authorized the founders to take action the firm

---

[1] "Redemption" generally refers to the "act or an instance of reclaiming or regaining possession by paying a specific price," including "reacquisition of a security by the issuer." *Redemption*, BLACK'S LAW DICTIONARY, at 1530 (11th ed. 2019).

[2] TEX. BUS. ORGS. CODE § 21.801.

[3] *Id.* § 303.004(b)(1).

[4] *Id.* § 303.004(b)(2).

[5] *See id.* §§ 21.101, .104, 303.001.

[6] 665 S.W.3d 637, 642, 651 (Tex. App.—Fort Worth 2021).

2

could take, but it did not constitute the departing shareholder's agreement that the founders may set redemption terms of their own accord *on his behalf*. Nor does the resolution itself "specif[y]" any redemption terms. And because *the firm* was not authorized—by statute, governing document, or shareholders' agreement—to set the redemption terms without the departing shareholder's agreement, the resolution did not independently authorize *the founders* to unilaterally determine those terms. The case is remanded to the trial court for further proceedings.

## I. Background

In 1992, the predecessor of Friedman, Suder & Cooke, P.C. (FSC) incorporated as a law firm professional corporation. As of 1999, the firm had four shareholders, three of whom remain with FSC to this day: Walker Friedman, Jonathan Suder, and Michael Cooke (collectively, the Founders). A relatively small, closely held corporation,[7] FSC hired David Skeels in 2007, and he became a shareholder within four years. As an employed shareholder, Skeels received a portion of his practice team's aggregate contingent-fee recoveries less expenses.

Although FSC's articles of incorporation authorized 100,000 shares of common stock, amendments declared that "no shares ha[d]

---

[7] S*ee* TEX. BUS. ORGS. CODE § 21.563(a) (a "closely held corporation" has "fewer than 35 shareholders" and no publicly traded shares). "A 'closely held corporation' is not to be confused with a 'close corporation.'" *Sneed v. Webre*, 465 S.W.3d 169, 177 n.6 (Tex. 2015). A close corporation may take advantage of statutory provisions "dedicated to the special needs of such corporations" that "exempt[] them from many of the rules that govern other types of corporations." *Ritchie v. Rupe*, 443 S.W.3d 856, 880 (Tex. 2014). Although any corporation can "elect to operate as a 'close corporation' by so providing in the appropriate corporate documents," *id.* at 879 n.34, FSC did not elect to do so.

been issued." Nevertheless, Cooke explained that FSC "deemed" its shareholders to have an "equivalent number" of shares based on "pro rata ownership" and that new shareholders received "an undetermined amount of shares," which later became "determined" when FSC created stock certificates in 2014.

Before 2014, only three shareholders had left FSC. FSC's articles of incorporation did not address share redemption or prescribe what would happen to a departing shareholder's shares. According to Cooke, each departing shareholder had "released any rights to their shares" in "negotiated separation agreements" with "settlements of claims or potential claims" and "[m]utual releases."

The resolution central to the issue now on appeal was crafted in connection with a 2014 IRS audit of FSC. After an initial meeting with an agent, FSC's office manager explained in a memorandum that the IRS "wants to see that we are a real corporation acting like a real corporation." The manager admonished that FSC had "some work to do with respect to our record keeping" before reconvening with the IRS agent: "Purchase a stock book and issue the stock correctly"; "Show voided stock for partners who left the firm"; "Create stock for newer partners"; and "Back date." To that end, FSC formally issued—but did not actually distribute—backdated certificates of 1,000 shares of common stock to each of its shareholders.

The day before the next IRS meeting, Cooke prepared the following resolution (the 2014 Resolution), which FSC's shareholders, including Skeels, signed:

4

**RESOLUTION**
**02/11/14**

WHEREAS, Friedman, Suder & Cooke, P.C. (the "Firm") desires to ratify, confirm and memorialize in writing a policy and practice of the Firm, and a right possessed by Walker Friedman, Jonathan Suder and Michael Cooke, before any current shareholder other than Walker Friedman, Jonathan Suder and Michael Cooke became a shareholder in the Firm;

WHEREAS, such policy, practice and right is that Walker Friedman, Jonathan Suder and Michael Cooke collectively have been entitled to take affirmative action and veto any vote or action taken by or on behalf of the Firm notwithstanding the number of shareholders, or the number of shares issued to any shareholder;

NOW, THEREFORE, be it resolved as follows:

1. Notwithstanding the number of shareholders, or the number of shares issued to any shareholder, Walker Friedman, Jonathan Suder and Michael Cooke, collectively, have been entitled, and shall continue to be entitled, *to take affirmative action on behalf of the Firm*, and veto any vote or action taken by or on behalf of the Firm, and/or by any other shareholder, whether individually, or collectively.[8]

Cooke later explained that because the Founders were "putting something in writing to show share ownership when before it had been just an unwritten policy and practice of how we consider ourselves shareholders," they "didn't want there to be a record in place having equal share ownership when that did not reflect actual control and

---

[8] Emphasis added.

5

management of the firm." Thus, "it was important to have another document and agreement in place"—the 2014 Resolution—"to reflect that ultimate power and control existed with" the Founders.

From 2014 through 2015, Skeels grew dissatisfied with FSC and began to look elsewhere for employment. In December 2015, after discovering emails between Skeels and another shareholder, Decker Cammack, criticizing one of the Founders, FSC terminated Skeels's and Cammack's employment. Cooke told Skeels that he would need to return his shares in a "procedure" involving "some sort of agreement, like a release of claims to shares or some sort of redemption agreement." FSC proposed separation terms, including that Skeels tender his shares with mutual releases and receive $50,000 (later increased to $75,000) when proceeds came in from a specific matter he had worked on for FSC. Skeels did not accept the terms and hired a lawyer to help determine the value of his shares. Shortly before Skeels and Cammack joined another law firm in January 2016, Skeels asked to inspect FSC's books before responding to its "proposals concerning [his] involuntary separation." Skeels alleges FSC refused his request.

The next month, FSC sent a letter asking Skeels to "voluntarily surrender" his shares, "just as Decker Cammack did." Otherwise, the letter would serve as notice that the shares would be redeemed "pursuant to the [2014] Resolution" and the requirements in Section 21.305 of the Business Organizations Code. Skeels was informed that, "consistent with the value that other departing shareholders received," the redemption price would be "zero." Skeels responded that FSC lacked "any specific authority to redeem or value shares" and that he owned "common stock," not "redeemable shares."

6

Skeels then sued FSC, Cooke, and Suder (collectively, the Firm), seeking, among other things, declarations that (1) the attempted redemption was void because the 2014 Resolution was not a governing document or shareholders' agreement under Sections 1.002(36), 21.101(a), and 21.305 of the Business Organizations Code; (2) the certificate of formation did not contain a redemption provision; and (3) the parties had not agreed on the redemption price. FSC counterclaimed for a declaration that the 2014 Resolution authorized the Founders' redemption actions. The Firm also moved for sanctions.[9]

Throughout the proceedings, the Firm has continually refashioned its justification for its redemption authority. After Skeels noted that FSC shares were common stock not designated as redeemable, the Firm agreed that shares are "not generally redeemable" under Chapter 21 and, to make them redeemable under Section 21.305, "shares must be designated as redeemable on the share certificate or as stated in the certificate of formation."[10] The Firm then shifted focus to

---

[9] Skeels initially brought a shareholder derivative suit that, according to the Firm, included ad hominem attacks and disclosed confidential information. After FSC, Cooke, and Suder each moved for sanctions, Skeels amended his petition, dropping the derivative claims. The trial court awarded sanctions to Cooke and Suder and attorney's fees to FSC, concluding that Skeels brought the lawsuit to embarrass and harass the Firm. In a ruling unchallenged in this Court, the court of appeals reversed those awards. 651 S.W.3d at 64.

[10] *See* TEX. BUS. ORGS. CODE §§ 21.154(a)(1), .210, .305(a). "[A]rticles of incorporation" are now referred to as the "certificate of formation." *See, e.g.*, *id.* §§ 1.002(6), .006(1); Byron F. Egan, EGAN ON ENTITIES: CORPORATIONS, PARTNERSHIPS AND LIMITED LIABILITY COMPANIES IN TEXAS 22 (4th ed. 2023) ("[T]he document a filing entity must file with the Secretary of State to be duly organized under Texas law is now simply called a 'certificate of formation,' whereas previously each entity had its own name for such document.").

Section 303.004, which broadly authorizes professional corporations to redeem shares and provides options for setting the redemption terms, including when "governing documents" specify the terms.[11] The Firm argued that, because the 2014 Resolution established the Founders as FSC's "[g]overning authority"[12] in a "governing document," "redemption of shares is left largely to the discretion of the professional corporation and the professionals serving as part of its governing authority."

At a pretrial conference, the Firm changed tack again, presenting the 2014 Resolution as a "shareholders' agreement." Chapter 21 of the Business Organizations Code authorizes shareholders' agreements that govern "the exercise or division of voting power," "even if the terms of the agreement are inconsistent with this code."[13] Thus, according to the Firm, the 2014 Resolution authorized the Founders "to take whatever action they want" to redeem shares; "[t]hat is the end of the analysis."

The trial court agreed, signing an order granting FSC's counterclaim, denying Skeels's declaratory-judgment claim, and declaring that the 2014 Resolution authorized the Founders' redemption actions. When the court called the case for trial, Skeels's counsel represented that none of Skeels's other claims survived the interlocutory

---

[11] *See* TEX. BUS. ORGS. CODE § 303.004.

[12] *See id.* § 1.002(35)(A) (defining "Governing authority"); Egan, *supra* note 10, at 22 (although "each entity typically has a particular person or set of persons which govern that type of entity," the Business Organizations Code "replaces all those different terms and simply refers to the persons or entities that control the entity as that entity's 'governing authority'").

[13] TEX. BUS. ORGS. CODE §§ 21.101(a)(7), .104.

order. After taking up the Firm's sanctions motions, the merits of which are not at issue here,[14] the court signed a final take-nothing judgment.

The court of appeals affirmed,[15] concluding that the 2014 Resolution's "broad language" permitted the Founders to take affirmative action "with no limitation placed on that power" and "allowed the governing authority to set the terms of any share redemption as it saw fit."[16] In a dissent, Justice Birdwell accused the majority of "read[ing] too much into the Resolution" when it "did not contemplate share redemption" and "does not purport to expressly allow the [Founders] to unilaterally set the price and terms of share redemption."[17] We granted Skeels's petition for review.[18]

---

[14] *See supra* note 9.

[15] The court of appeals initially reversed the declaratory judgment but then affirmed on rehearing and further rehearing. No. 02-18-00112-CV, 2020 WL 5666555 (Tex. App.—Fort Worth Sept. 24, 2020), *opinion withdrawn*, 2021 WL 1538254 (Tex. App.—Fort Worth Apr. 12, 2021, order) (per curiam), *and opinion superseded on reh'g*, 2021 WL 2460862 (Tex. App.—Fort Worth June 17, 2021), *opinion withdrawn and superseded on further reh'g*, 665 S.W.3d 637 (Tex. App.—Fort Worth 2021).

[16] 665 S.W.3d at 642, 650-51.

[17] *Id.* at 665, 673 (Birdwell, J., dissenting). Although Justice Birdwell agreed with the majority that the sanctions and attorney's fee awards should be reversed, he expressly noted, "I do not think this holding should be taken to mean that I (or this court, for that matter) condone this litigation in general"; the litigation "appear[s] to have been undertaken with a purpose beyond the recovery of simple damages"; and "the situation was not improved by the attempt to force cancellation of shares that were not required by law to be redeemed so that an inactive shareholder would arguably have no legal right to access books and records that would have likely confirmed the potentially minimal damage recovery." *Id.* at 674-75.

[18] In an amicus letter, Professor Elizabeth Miller questions the lower courts' characterization of the 2014 Resolution as a Chapter 21 shareholders' agreement that authorizes unilateral determination of redemption terms.

## II. Discussion

Texas Rule of Civil Procedure 166 empowers a trial court to convene a pretrial conference to identify the "legal matters to be ruled on or decided by the court" and to issue appropriate orders "to assist in the disposition of the case without undue expense or burden to the parties."[19] When a trial court's order "disposes of claims in this fashion," it "is akin to a summary judgment or directed verdict, and review is de novo."[20] But judgment without a jury verdict is proper "only when the law does not allow reasonable jurors to decide otherwise."[21]

### A. Statutory Framework

To contextualize the parties' dispute, we begin with an overview of the statutory framework. Title 7 of the Business Organizations Code governs professional entities.[22] Chapters 301 and 303 govern professional corporations that are "formed for the purpose of providing a professional service," including legal services.[23] Although a professional corporation resembles other for-profit corporations by

---

Professor Franklin Snyder and Eric Fryar, as amici supporting Skeels, argue that the Firm's unilateral redemption of Skeels's shares for zero value extinguishes property in violation of a corporation's quasi-fiduciary duties. They further warn against construing a nonspecific grant of decision-making authority as conferring the power to cancel a shareholder's shares.

[19] TEX. R. CIV. P. 166(g); *see also JPMorgan Chase Bank, N.A. v. Orca Assets G.P.*, 546 S.W.3d 648, 653 (Tex. 2018).

[20] *Orca Assets*, 546 S.W.3d at 653.

[21] *Id.* (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 832 (Tex. 2005)).

[22] *See generally* TEX. BUS. ORGS. CODE §§ 301.001–304.001.

[23] *Id.* §§ 301.001(a), .003(3), (8), 303.001–.006.

10

offering limited shareholder liability,[24] Title 7 restricts who may be shareholders. Individual shareholders of law firm professional corporations must be licensed attorneys,[25] and their ownership interests may be transferred only to other persons or entities authorized to provide legal services.[26] If a shareholder or successor to the interest is or becomes unauthorized to provide legal services, such person "shall promptly relinquish" the interest.[27] In that case, the professional corporation "shall purchase or cause to be purchased" the surrendered interest on terms that "may be provided by the governing documents of the entity or an applicable agreement."[28]

On the other hand, if a departing shareholder continues to be authorized to provide legal services, Title 7 does not address whether the shareholder must relinquish the ownership interest. But Section 303.004 helps ensure that a professional corporation has an opportunity to redeem those shares:

(a) A professional corporation may redeem shares of a shareholder, including a deceased shareholder.

(b) The price and other terms of a redemption of shares may be:

---

[24] *Id.* § 303.002(b).

[25] *See id.* §§ 301.003(5), .004(2), .007(a). A professional corporation may also issue shares to other professional organizations. *See id.* §§ 301.003(7), .004(2), .007(a).

[26] *Id.* § 301.009; *see also id.* §§ 301.003(3), (5), (7), .004(2), .007(a).

[27] *Id.* § 301.008(b)–(c).

[28] *Id.* § 301.008(d).

11

(1) agreed to between the board of directors of the professional corporation and the shareholder or the shareholder's personal representative; or

(2) specified in the governing documents of the professional corporation or an applicable agreement.[29]

Shareholders in a closely held professional corporation may desire even greater freedom in the redemption process because selling non-publicly traded shares is not only difficult, but sometimes impossible.[30] To "address and resolve such difficulties," shareholders may enter into "shareholder agreements that contain . . . redemption provisions that reflect their mutual expectations and agreements."[31] To that end, Chapter 21 is also potentially relevant in providing that a compliant shareholders' agreement is "effective among the shareholders and between the shareholders and the corporation even if the terms of the agreement are inconsistent with [the Code]."[32] Thus, in evaluating

---

[29] *Id.* § 303.004.

[30] *Ritchie v. Rupe*, 443 S.W.3d 856, 871 (Tex. 2014); *see also id.* at 881 ("Of course, shareholders may also prevent and resolve common disputes by entering into a shareholders' agreement to govern their respective rights and obligations. Importantly, the Legislature has granted corporate founders and owners broad freedom to dictate for themselves the rights, duties, and procedures that govern their relationship with each other and with the corporation." (citing TEX. BUS. ORGS. CODE §§ 21.052–.059, .101–.110, .210, .401–.408)).

[31] *Id.* at 871; *see also id.* at 883 n.46 (noting that the Legislature has placed limits on corporate redemptions to protect creditors (citing TEX. BUS. ORGS. CODE §§ 21.301–.318)).

[32] TEX. BUS. ORGS. CODE § 21.104; *see also id.* §§ 21.101 (authorizing shareholders to enter into a shareholders' agreement as to specified matters),

a professional corporation's redemption of shares, we consider whether any Chapter 21 shareholders' agreements or any documents or agreements as described in Section 303.004(b) either set the redemption terms or authorize who may determine those terms.

### B. The 2014 Resolution

The crux of the parties' dispute is whether the 2014 Resolution—by authorizing the Founders "to take affirmative action on behalf of the [f]irm"—either (1) satisfies one of Section 303.004(b)'s two options for setting the redemption terms for Skeels's shares or (2) constitutes a Chapter 21 shareholders' agreement that independently authorizes the Founders to unilaterally determine the redemption terms. The Firm relies solely on the 2014 Resolution and does not rely on any other governing document or agreement to redeem Skeels's shares.[33] At its core, the dispute turns on whether Skeels, by signing the 2014 Resolution, agreed to allow the Founders to redeem his shares on any terms and at any price they may choose. He did not.

When construing an agreement, undefined terms are typically given their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense.[34] We enforce agreements as written, and if the terms are plain,

---

303.001 (making Chapter 21 applicable "to a professional corporation, unless there is a conflict with this title").

[33] The Firm also does not rely on the 2014 Resolution's language that the Founders are entitled to "veto any vote or action taken by or on behalf of the [f]irm, and/or by any other shareholder, whether individually, or collectively."

[34] *Farmers Grp., Inc. v. Geter*, 620 S.W.3d 702, 709 (Tex. 2021).

13

definite, and unambiguous, we cannot alter their meaning under the guise of construing them.[35]

To conclude that the Founders held an "unfettered right" to take action with "no limitation placed on that power," the court of appeals focused on the resolution's "affirmative action" language.[36] But the 2014 Resolution does not authorize any action without limitation because, textually, "affirmative action" is modified by "on behalf of the [f]irm."

According to the plain meaning of "on behalf of," the 2014 Resolution authorized the Founders to act only as FSC's agent or representative.[37] A general, nonspecific authorization to act as an entity's agent or representative does not independently authorize action the entity would not otherwise be permitted to take. The Firm has not established that FSC has ever been authorized to set the redemption price and other redemption terms without the departing shareholder's agreement, and the adoption of the 2014 Resolution did not change that. FSC's governing documents did not address redemption, and Cooke admitted that he is "not aware of any company document that

---

[35] *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 753 (Tex. 2006).

[36] 665 S.W.3d 637, 650, 652 (Tex. App.—Fort Worth 2021).

[37] *See Behalf*, BLACK'S LAW DICTIONARY, at 189 (11th ed. 2019) ("[O]*n behalf of* means 'in the name of, on the part of, as the agent or representative of.'"); *Behalf*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, at 162 (5th ed. 2016) (noting that "[a] traditional rule holds that *in behalf of* and *on behalf of* have distinct meanings" and "*on behalf of* means 'as the agent of, on the part of'"); *see also In re Davenport*, 522 S.W.3d 452, 457 (Tex. 2017) ("Courts may look to dictionaries to discern the meaning of a commonly used term[.]").

specifically addressed redemption." Crucially, the 2014 Resolution did not expand the scope of FSC's authorized actions; it simply designated who may act on FSC's behalf.[38]

The Firm alleges the record nonetheless establishes FSC's "historical policy and practice" that "one cannot be a shareholder if he is not an attorney in the [f]irm, nor will he be paid any money for his shares upon departure" and that this policy and practice "informs the meaning" of the 2014 Resolution's phrase "affirmative action." The record supports the Firm's claim that FSC did not pay any money to reacquire shares held by the shareholder who departed concurrently with Skeels. And the Firm asserts that the three shareholders who departed FSC before 2014 "tendered their share[s] without monetary compensation."[39] But each of these departing shareholders *agreed to* "negotiated separation agreements" that involved "releas[ing] any rights to their shares," "settlements of claims or potential claims," and "[m]utual releases." Similarly, when FSC terminated Skeels's employment, Cooke told him that he would need to return his shares and "the procedure would be some sort of agreement, like a release of claims to shares or

---

[38] In effect, the 2014 Resolution appears to designate the Founders as FSC's "governing authority" with general unanimous written consent to "take action without holding a meeting, providing notice, or taking a vote." *See* TEX. BUS. ORGS. CODE § 6.201(b). Although a "governing authority" is authorized to "manage[] and direct[] the business and affairs of the domestic entity," it does so "[s]ubject to the title of this code that governs the domestic entity and the governing documents of the domestic entity." *Id.* § 3.101.

[39] Skeels presented no evidence that FSC paid money to past departing shareholders for their shares but alleges that the Firm has not produced the separation agreements and that "[t]he circumstances under which prior shareholders left [FSC] and the value of the consideration they received for their shares have never been fully explored."

15

some sort of redemption agreement." This historical course of dealings shows that when FSC reacquired shares from departing owners, the redemption terms were part of a separation package in a bilateral transaction with mutual consideration, regardless of whether the consideration they received was monetary or not. The record bears no evidence that FSC reacquired shares from departing shareholders in unilateral transactions with prices and terms dictated by FSC or the Founders.

Although the 2014 Resolution's phrase "affirmative action" could broadly encompass share-redemption actions, those actions must still be undertaken "on behalf of the [f]irm." For example, consistent with FSC's past practices, the resolution appears to authorize the Founders to negotiate redemption terms with a departing shareholder and to redeem the shares on terms "agreed to" by the shareholder.[40] But by signing the resolution, Skeels did not prospectively agree that the Founders may determine the redemption price and terms on both FSC's behalf *and his behalf*. In other words, the resolution does not reflect that "the shareholder" or his "personal representative" "agreed to" any "price and other terms of a redemption of shares," as contemplated by Section 303.004(b)(1). By the same token, even if the resolution were a compliant Chapter 21 shareholders' agreement—a question we do not reach today—its terms did not independently authorize the Founders to unilaterally determine the redemption terms.[41]

---

[40] *See id.* § 303.004(b)(1).

[41] *See id.* §§ 21.101 (authorizing and delineating the permissible purposes of a "shareholders' agreement"), .104 (authorizing enforcement of a compliant shareholders' agreement even if its terms conflict with the Code).

Nor does the 2014 Resolution "specif[y]" any redemption terms.[42] The resolution is inarguably silent about redemption, so it certainly cannot be specific, as the statute requires. The Firm has posited that it "could at any time amend a governing or other formational document to expressly address the issue." But it reports that FSC and the Founders "have not done that and do not want to do it." Accordingly, at this juncture, there are no governing documents or applicable agreements specifying the price and other terms to satisfy Section 303.004(b)(2)'s option to set the redemption terms.[43] The Firm could conceivably change this,[44] but it undisputedly has not.

When all is said and done, Skeels's shares may prove to have little to no market value.[45] But even without regard to their market value, Skeels may have desired to hold on to his shares as personal property

---

Because the 2014 Resolution does not authorize the Founders to determine the redemption terms in a manner inconsistent with Section 303.004(b), we need not explore any limitations on Section 21.104's parameters or how that provision interacts with Section 303.004(b).

[42] *See id.* § 303.004(b)(2).

[43] *See id.*

[44] *See id.* §§ 3.051(a) ("A filing entity may amend its certificate of formation."), .052(a) (stating that the amendment procedure "is as provided by the title of this code that applies to the entity").

[45] *See, e.g.*, Christopher C. Wang, *Breaking Up Is Hard to Do: Allocating Fees from the Unfinished Business of a Professional Corporation*, 64 U. CHI. L. REV. 1367, 1395 (1997) ("If an attorney-shareholder leaves a professional corporation and nothing . . . provides for an automatic redemption of shares, the attorney may end up holding shares that are valueless because of the lack of a market for them.").

when he departed FSC.[46]  FSC, in turn, may attempt to amend its governing documents and exercise redemption under Section 303.004(b)(2).  We express no opinion on the value of Skeels's shares because that is a question for another day.  Rather, we hold that the Firm did not establish as a matter of law that, based on the 2014 Resolution, the Founders could determine the redemption price and redeem Skeels's shares without his agreement.  The court of appeals erred in concluding otherwise.

---

[46] Although Title 7 does not address whether a licensed attorney must relinquish any ownership interest when separating from a professional corporation, the Firm notes that Skeels has been "an employee and/or equity member" of a competing law firm throughout this litigation.  The briefing is silent about whether the rules governing professional conduct—or any other authority—prevents an attorney from continuing to hold shares in a law firm professional corporation while being employed with or owning interests in a competitor. *Cf. Berrett v. Purser & Edwards*, 876 P.2d 367, 370-71 (Utah 1994) (noting hypothetical ethical concerns that may arise when a licensed attorney shareholder in a professional corporation has her employment terminated and works for another law firm without having her shares redeemed).  We do not address this unraised issue here, and our opinion should not be understood to invite this practice or express any view regarding the ethical implications of such an arrangement. *See Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 782 (Tex. 2020) ("Our adversary system of justice generally depends 'on the parties to frame the issues for decision and assign[s] to courts the role of neutral arbiter of matters the parties present.'" (alteration in original) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008))).  We confine our holding to the meanings of the 2014 Resolution and Section 303.004, and we expect attorneys and law firms to comply with all applicable ethical obligations.  "Hopefully, possible ethical problems will motivate both attorneys and law firms to provide by agreement, article, or bylaw for the disposition of shares in case of employment termination." *Berrett*, 876 P.2d at 371.

### III. Conclusion

Because the 2014 Resolution did not authorize redemption of Skeels's shares on terms dictated by the Founders, we reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.

<div style="margin-left: 40%;">

_____

John P. Devine
Justice

</div>

**OPINION DELIVERED:** June 23, 2023